UNITED STATES of America, Appellee,

v.

Elvin Lee BYNUM et al., Appellants.

Nos. 1137–1142, Dockets 72–1857, 72–1884, 72–2101, 72–1763, 72–2142, 72–2143.

United States Court of Appeals, Second Circuit.

On Submission to the Court July 2, 1973.

Decided Sept. 24, 1973.

W. Cullen MacDonald, Asst. U.S. Atty., New York City (Paul J. Curran, U.S. Atty., Southern District of New York, John W. Nields, Jr., Asst. U.S. Atty., of counsel), for appellee.

Henry J. Boitel, New York City, for appellant Bynum.

Patrick M. Wall, New York City, for appellants Cordovano, Wright, Small, Mitchell, Garnett, Dyson, Birnbaum, Feroldi and Nedd.

H. Elliot Wales, New York City (Michael P. Di Renzo, New York City, on the brief), for appellants Coniglio and Tuzzolino.

Jerome Lewis, New York City, for appellant Mele.

Frank A. Lopez, Brooklyn, N. Y., for appellant Altamura.

Before KAUFMAN, Chief Judge, and SMITH and MULLIGAN, Circuit Judges.

MULLIGAN, Circuit Judge:

On a previous appeal to this court we remanded this case to the trial judge,

Hon. Milton Pollack, United States District Judge, Southern District of New York, for a hearing to determine whether certain wiretap evidence used at trial had been legally obtained. United States v. Bynum, 475 F.2d 832 (2d Cir. 1973). After the hearing, Judge Pollack issued his findings of fact and conclusions of law, upholding the validity of the wiretaps. 360 F.Supp. 400 (S.D.N.Y.1973). We now affirm the convictions in all respects.

## I. THE FACTS

On October 13, 1971 an indictment was filed, charging appellants Bynum, Cordovano, Wright, Small, Mitchell, Garnett, Dyson, Coniglio, Mele, Feroldi, Altamura, Birnbaum, Tuzzolino and Nedd with conspiracy to deal unlawfully in narcotic drugs in violation of 21 U.S.C. §§ 173, 174 (repealed 1970) and 26 U.S.C. §§ 4705(a), 7237(b) (repealed 1970). All appellants were found guilty on this charge. The second count of the indictment separately charged appellant Nedd with carrying a firearm during this conspiracy in violation of 18 U.S.C. § 924. Nedd was found guilty on this charge.[1]

The primary purpose of the conspiracy, which was alleged to exist chiefly in New York City, from January 1, 1970 until April 30, 1971, was to obtain, process and distribute large amounts of narcotic drugs which had been unlawfully imported into the United States. The furtherance of the common scheme involved one unsuccessful robbery, together with the near fatal shooting of the victim, another aborted robbery and an elaborate plan to murder a corrupt New York City patrolman, who was thought to be cooperating with the authorities. The Government's case rested principally upon the evidence of George Stewart, a veteran and former college student, whose record was respectable until he invested in a Manhattan restaurant which eventually stripped him of his resources and indebted him to appellant Cordovano, a customer. At Cordovano's suggestion Stewart embarked on a career of selling cocaine in order to repay his debts. Cordovano and Bynum were the key figures in the drug conspiracy here revealed. Bynum was the banker for the group, supplying large sums of money for the purchase of heroin and cocaine. He and Cordovano supplied the drugs and supervised their mixing, cutting, packaging and distribution through Harlem. The distributors there were Wright, Small, Mitchell, Garnett and Dyson. The suppliers of the ring were Altamura, Mele, Coniglio, Tuzzolino, Birnbaum and Feroldi who normally operated through Cordovano.

From May 1970 on, Stewart sold heroin and cocaine for Cordovano on a consignment basis, sharing the profits. Stewart was eventually introduced to Bynum, Coniglio and Mele by Cordovano, and Stewart's role in the group became increasingly important. In September 1970, Cordovano purchased 5 kilos of heroin from Coniglio and Mele for $72,500 in cash which had been supplied by Bynum. Stewart picked up the heroin. Some of the drugs were delivered to Bynum through Cordovano and the remainder were stored in Stewart's girlfriend's apartment. At Cordovano's instruction, Stewart delivered 2 kilos on October 29th to a customer, Shaw, who paid him $38,000. Shaw in turn unwittingly resold to an undercover agent. Stewart was arrested at this sale and was found to possess ⅛ of a kilo of heroin as well as a gun. Bynum supplied the collateral for Stewart's bail bond.[2] In December 1970, Stewart was rearrested since a prior sale had also resulted in another resale to an undercover agent. It was at this juncture that Stewart was approached by the Government and agreed to become an informant.

---

1. The disposition of the charges against other defendants as well as a list of those who were named as co-conspirators but not as co-defendants, are set out in our prior opinion. United States v. Bynum, 475 F.2d 832, 834 n.2 (2d Cir. 1973).

2. Bynum testified that he posted collateral for Small's, Wright's and Mitchell's bail bonds after their arrests on the present charges. Defendant Garnett pledged her house as collateral for Cordovano's bond.

On January 10, 1971, Stewart, at Cordovano's request, proceeded to Bynum's residence with a device for sealing plastic bags. Wright, who was expected to arrive with 2 kilos of heroin to be cut, appeared without the drugs since he was apprehensive of police detection. Bynum, Wright and Garnett left Stewart for another location. Later in the evening they returned to Bynum's apartment complaining of nausea resulting from the inhalation of heroin dust during the cutting operation. Cordovano subsequently brought to Bynum's apartment 5 kilos of cocaine which he stated he had purchased from Altamura. Bynum cut ½ kilo of this cocaine with an adulterant. Stewart took a sample of this and the balance was given to Wright. The 4½ kilos of uncut cocaine were stored at the apartment of Stewart's girlfriend and at Cordovano's mother's apartment. Later in January, Stewart met Cordovano, Altamura, Coniglio and Mele at a wake. It was at this point that their conversations indicated that there was a serious shortage of drugs for the local market. Altamura stated that he had a source but the promised sale eventually fell through when his seller demanded $36,000 for 2 kilos of heroin on February 19, 1971.

At this point, desperate to obtain heroin, the core group adopted less orthodox but predictable means of assuring their continuing business. Cordovano and Bynum discussed with Stewart the possibility of robbing one Marty Carlin, a drug dealer who they believed had large quantities of heroin and cash stored in his safe. The plan was that Nedd and one Michael Libbers (an original co-defendant whose motion to dismiss was granted below) would take Carlin to an apartment selected by Stewart where Carlin would be "persuaded" to reveal his safe's combination. Eventually, in March 1971, Bynum, Nedd, Cordovano and Stewart made the final plan to rob Carlin. Nedd located Carlin at a westside hotel, but Carlin resisted and was shot by Nedd. Although he was seriously wounded, Carlin was able to identify Nedd as his assailant. When Nedd was subsequently arrested in New Jersey, he had jewelry belonging to Carlin as well as identification papers belonging to another victim of the attempted robbery.

In the meantime, other efforts were made to secure heroin. On February 25, 1971, Stewart was given $65,000 in cash at Bynum's direction to pay to Altamura for heroin to be turned over for cutting and sale to Garnett and Dyson. Altamura had only cocaine and no heroin. It was then decided to purchase 2 kilos of heroin from Birnbaum whose source was Feroldi. After giving a kilo of plaster in order to cautiously test the delivery plans, Feroldi finally delivered a kilo of heroin on March 13, 1971 to Stewart and Cordovano. Cordovano brought it to Bynum at Dyson's home for cutting. It proved to be impure in quality and somewhat less in quantity than represented.

On March 29, 1971, after meetings with Cordovano, Altamura delivered 2 kilos of heroin to Cordovano and Stewart who brought it to Bynum at Dyson's house. Bynum, Dyson, Garnett, Mitchell, Wright, Cordovano and Stewart, all participated in the cutting and packaging of the drug.

Early in April, 1971, Cordovano and Stewart held separate meetings with Tuzzolino and with Coniglio and Mele for a 5 kilo purchase of heroin. A 2 kilo purchase of heroin was made from Tuzzolino using Feroldi's car to make delivery to Stewart who in turn delivered it to Cordovano. After a variety of furtive maneuvering, this was followed by the usual cutting and repackaging operation at Dyson's residence with Bynum, Cordovano, Stewart, Garnett, Dyson and Small participating.

Cordovano and Bynum also proceeded to plan with Moody (a prosecution witness) to steal heroin and money from two drug dealers in Washington, D. C. Feroldi was an added starter, participating in the planning in mid-April, 1971. The theft was never consummated despite a trip to Washington by Feroldi

and Moody who were telephoning Cordovano for advice. They left behind them in Washington police uniforms, chloroform, tape, a sledge hammer and a trunk with a .38 caliber pistol in it. Bynum paid some of their expenses for this aborted scheme.

On April 29, 1971, the partnership business came to an abrupt termination. Bynum and Garnett advised Stewart that an informant had betrayed them. He was identified as corrupt New York City patrolman Wollack who was believed to be talking to federal authorities. Cordovano and Bynum planned that Garnett was to have Wollack visit her home on a pretext. Cordovano and Stewart were to follow him from Garnett's home to the meat market operated by Bynum and Cordovano where he was to be knocked out, searched for bugging equipment, shot to death and placed in a plastic bag. Stewart, who at this point was fully accepted as a member of the core group, even purchased surgical gloves at Bynum's suggestion that the gloves would foil any paraffin test indicating that the apprehended person had recently fired a gun. Stewart fortunately alerted the authorities. Cordovano and Stewart were apprehended en route to the scene, and each was found to possess a loaded hand gun. Two other loaded guns were found in the car.

While the furtive and devious movements of drug conspiracies such as this are unfortunately routinely encountered in the federal courts of this circuit, the detailed facts which amply document and support the Government's case here, are uniquely provided by the informant witness Stewart, whose regular reports to Government agents enabled them to independently make surveillance and confirm the conspiracy and the overt acts charged in the indictment. Thus Stewart's "sample" of cut cocaine received from Bynum on Jaunary 10, 1971 was turned over to agents on January 19, 1971. The $65,000 in cash delivered to Stewart on February 25, 1971 at Bynum's request was later photographed by agents. Birnbaum's attempted delivery on March 2, 1971 was subjected to surveillance by agents. The Altamura sale on March 29, 1971 and the subsequent cutting operation were observed by agents. The April 9, 1971 Tuzzolino sale and cutting operation were also under surveillance, with Stewart managing to discard packages which were recovered by agents who were able to determine that pure heroin traces still adhered to the original containers.

## II.  A SINGLE CONSPIRACY

Defendants Birnbaum, Altamura, Tuzzolino, Coniglio, Mele, Wright, Small, Mitchell, Garnett and Dyson seek reversal of their convictions on the ground that the Government did not prove one conspiracy but rather multiple individual conspiracies. Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). The Government established beyond a reasonable doubt a large scale drug sale conspiracy in this case between January 1970 and April 1971. The pattern is now familiar. Raw drugs in large quantities have to be imported and supplied. In this case the core operators Bynum and Cordovano, respectively, supplied the capital and the contact with the suppliers who provided the raw material. The raw drugs then had to be adulterated or cut, packaged and then resold to purchasers who eventually made them available to the victims. In more normal business ventures this would be described as a vertically integrated loose-knit combination. The point of course is that each level of the operation depends upon the existence of the other, and the mutual interdependence of each is fully understood and appreciated by the other. This knowledge on the part of Bynum and Cordovano operating in the middle layer is obvious. The supplier defendants Birnbaum, Altamura, Feroldi, Tuzzolino, Coniglio and Mele could not reasonably suppose that the large amounts of raw cocaine and heroin received by Bynum and Cordovano were not to be resold at the tremendous profits this

business produces. The defendants Wright, Small, Mitchell, Garnett and Dyson who participated in the cutting, repackaging and distribution of the drugs understood fully the roles of Bynum and Cordovano and that suppliers of the raw drugs had to be involved. This is the usual chain conspiracy encountered in drug cases. "Thus the conspirators, at one end of the chain knew that the unlawful business would not, and could not, stop with their buyers; and those at the other end knew that it had not begun with their sellers. That being true, a jury might have found that all the accused were embarked upon a venture, in all parts of which each was a participant, and an abettor in the sense that the success of that part with which he was immediately concerned, was dependent upon the success of the whole." United States v. Tramaglino, 197 F.2d 928, 930 (2d Cir.), cert. denied, 344 U.S. 864, 73 S.Ct. 105, 97 L.Ed. 670 (1952), quoting United States v. Bruno, 105 F.2d 921, 922 (2d Cir.), rev'd on other grounds, 308 U.S. 287, 60 S.Ct. 198, 84 L.Ed. 257 (1939). See also Blumenthal v. United States, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947); United States v. Vega, 458 F.2d 1234 (2d Cir. 1972); United States v. Agueci, 310 F.2d 817 (2d Cir. 1962), cert. denied, 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963). The fact that not all of the defendants may have known and worked directly with all of the others is not significant since it is clearly established that each knew from the scope of the operation that others were involved in the performance of functions vital to the success of the business. United States v. Calabro, 467 F.2d 973, 982–983 (2d Cir. 1972), cert. denied, 410 U.S. 926, 93 S.Ct. 1358, 35 L.Ed.2d 587 (1973).

The on-going nature of the partnership here and the roles assigned to the cast were established clearly in the record. The period of the conspiracy here, moreover, is comparatively short (16 months compared to 9 years in United States v. Borelli, 336 F.2d 376 (2d Cir. 1964), cert. denied, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965)), so that the participation of the defendants in the Bynum-Cordovano Harlem operation is more easily established.

With respect to the individual defendants who claim discrete conspiracies, we find ample proof of participation in the single conspiracy charged within the principles enunciated in the prior cases. Wright, Small, Garnett and Dyson were closely allied with Bynum and Cordovano in the cutting and packaging operation. Garnett and Dyson were girlfriends of Bynum, and Wright had worked for him for many years. They were obviously trusted associates. Wright's presence at cutting operations on the evening of January 10, 1971 was established. Moreover, Wright warned of police activity which resulted in a changing of plans as to the place of cutting. He was present later that evening at Garnett's home where Cordovano had produced 5 kilos of heroin and received ½ kilo from Bynum. On March 29 he was also present at the cutting operation and departed with one of the three bundles of adulterated heroin. Small, a friend and part-time employee, and Mitchell, also a friend of Bynum, were present at the March 29 cutting party and were assigned the two other bundles. Small was also present at the cutting operation on April 9, 1971. It is clear that the relationship here among the cutters and distributors was continuing, intimate and pursuant to common scheme or plan.

The connections of the suppliers with the operation were broad and extensive. Coniglio and Mele made the $72,500 sale to Cordovano in September, 1970. In January, 1971, they advised Stewart of the lack of heroin on the market and offered to sell 5 kilos to Cordovano in April, 1971, for $100,000. Their continuing willingness to participate is patent. Altamura supplied Cordovano with the 5 kilos of cocaine cut on January 11, 1971; he drove Cordovano to meet Bynum in February, 1971; he attempted to purchase 10 kilos of heroin at the same time; he spoke to Cordovano and Stew-

art numerous times in February and March, and finally delivered 2 kilos of heroin on March 29, 1971. He was entrusted with $49,000 in cash to make a purchase for the partnership. Birnbaum, who initially introduced a buyer to Cordovano and Stewart in the summer of 1970, appeared as a seller in February, 1971, offering Cordovano and Bynum 5 kilos of heroin for $90,000. He and his source, Feroldi, continued to promise delivery and on March 13 a kilo sale of heroin resulted after Feroldi had been given $15,000 and a gun by Cordovano. Feroldi promised to continue to search for a source. On March 2, 1971, Birnbaum had been entrusted with $38,000 to make a heroin purchase which was never consummated and the money was returned. Tuzzolino appears in April, 1971, as a prospective supplier of 5 kilos of heroin for $105,000 and was entrusted with $15,000 in cash. After several meetings, a 2 kilo sale was transacted.

While some of the suppliers may not have known the identity of other sellers, the inference was justified that each knew his supplies were only a small part of the raw drugs which the extensive Bynum-Cordovano operation processed and sold. See Blumenthal v. United States, *supra*, 332 U.S. at 554–555 n.14, 68 S.Ct. 248. In view of the large amounts of hard drugs involved and the large amounts of money advanced to suppliers, there is no question but that the Bynum-Cordovano partnership was conducting a regular business on a steady basis with numerous suppliers who intentionally and knowingly were either looking to or maintaining a close relationship with a solvent, ongoing apparatus.

## III.  SEVERANCE

### A.  *The Court's Charge*

■■ In view of this evidence of one conspiracy, the refusal to grant severances was proper. Some of the appellants, notably Mele and Çoniglio, argue that there was prejudice in failing to sever since the court below charged: "if you find that the Government has failed to prove the existence of only one conspiracy you must find the defendants not guilty." This is urged to be a prejudicial "all or nothing charge" condemned by this court in United States v. Borelli, *supra,* and in United States v. Kelly, 349 F.2d 720 (2d Cir. 1965), cert. denied, 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966). The argument in essence is that no jury would acquit *all* of the defendants since Bynum and Cordovano were clearly active in all of the ventures undertaken by the group. Hence the jury would convict all rather than let the principal malefactors go free. We cannot accept the argument since it fails to consider other portions of the trial court's charge which made it perfectly clear to the jury that if each of the defendants was not a knowing participant in the single conspiracy he must be acquitted. In short, it was not an "all or nothing charge." The court carefully charged:

In determining whether any defendant was a party, each is entitled to individual consideration of the proof respecting him or her, including any evidence of his or her knowledge or lack of knowledge, his or her status as a partner, manager or supervisor, his or her participation in key conversations, his or her participation in the plan, scheme or agreements alleged.

.    .    .    .    .    .

If you decide that the charged conspiracy existed between any of the defendants, you must then decide as to each defendant individually whether he or she joined the conspiracy with knowledge of either one or both of its purposes as alleged in the indictment.

Judge Pollack meticulously charged the elements and characteristics of the single conspiracy and summarized the Government's evidence as to each defendant and the evidence, if any, of each defendant who presented testimony. This alone takes up eighteen pages of the record. The contention therefore that the charge was prejudicial and in

violation of *Borelli* and *Kelly*, is unsupportable.

## B. *The Crimes of Violence*

■ The principal thrust of appellants' argument that multiple conspiracies existed rather than the single conspiracy charged in the indictment, lies not in the drug supply process and sales activity of the defendants but rather in the evidence presented to the jury of the attempted robbery and shooting of Martin Carlin, the planned robbery of the drug dealers in Washington, and the plan to murder the New York City policeman, Wollack. Those defendants, primarily Bynum and Cordovano, who participated in the crimes, claim that they were prejudiced by the evidence of "other crimes" and those conspirators who were not directly implicated claim prejudice by the "spill over" effect on the jury which would prejudice their right to a fair trial. Kotteakos v. United States, *supra.*

The actual participants in the crimes rely on the line of cases presented by United States v. Byrd, 352 F.2d 570 (2d Cir. 1965), and United States v. Deaton, 381 F.2d 114 (2d Cir. 1967), which hold that evidence of other crimes is admissible except when offered solely to prove criminal character. The other defendants maintain they were not responsible for the violent acts since these crimes were not within the fair import of the conspiracy as they understood it (United States v. Peoni, 100 F.2d 401, 403 (2d Cir. 1938)), and thus the trial court erred in not granting them a severance.

In this case the planned robberies and murder were not "other crimes" at all; they were part and parcel of the single drug conspiracy charged in the indictment. E. g., United States v. Leftwich, 461 F.2d 586, 589 (3d Cir. 1972); United States v. Persico, 425 F.2d 1375, 1384 (2d Cir.), cert. denied, 400 U.S. 869, 91 S.Ct. 102, 27 L.Ed.2d 108 (1970); Ignacio v. Territory of Guam, 413 F.2d 513, 519–520 (9th Cir. 1969), cert. denied,

397 U.S. 943, 90 S.Ct. 959, 25 L.Ed.2d 124 (1970); Rodriguez v. United States, 284 F.2d 863, 867 (5th Cir. 1960), cert. denied, 368 U.S. 1001, 82 S.Ct. 632, 7 L. Ed.2d 540 (1962). Moreover, as to the other defendants, these were not extramural frolics of wanton criminals introduced by the Government to establish to the jury that wicked men were in the dock. The Bynum-Cordovano group which was conducting an enormously profitable business, was faced early in 1971 with a shortage of heroin and cocaine. They discussed this with their suppliers and were desperately seeking new sources of hard drugs. The planned theft from Carlin, a drug dealer, was to supply heroin for the purpose of the conspiracy. His shooting was in furtherance of that purpose. The aborted Washington burglary was conceived by Cordovano and Bynum for the purpose of obtaining heroin and money. The planned killing of Wollack was to silence a suspected informant and thus to preserve the viability of the conspiracy.[3] The suppliers here were acutely aware of the shortage; that the "core group" would resort to violence to secure hard drugs or to protect the venture, could hardly be unanticipated or unexpected. See Rodriguez v. United States, *supra.*

We fail in any event to appreciate the defendants' argument that evidence of these crimes was so prejudicial as to arouse the "irrational passions of the jury" (United States v. Kaufman, 453 F.2d 306, 311 (2d Cir. 1971)), or to create in the jury "overmastering hostility." C. McCormick, Evidence § 190, at 453 (2d ed. E. Cleary 1972). Whether or not a jury will be so inflamed by allegedly extraneous criminal activity will of course depend upon what crime they have been accused of committing. United States v. Williams, 470 F.2d 915, 918 (2d Cir. 1972). The appellants here were engaged for profit in a major hard drugs venture in Harlem which not only dehumanized its ultimate customers but unquestionably spawned myriad crimes

---

3. See C. McCormick, Evidence § 190, at 451 & n. 48 (2d ed. E. Cleary 1972).

in a community already misery-ridden. No jury in New York can be unaware of the dimensions and consequences of the major operation which was graphically portrayed here. The revulsion of the average citizen to this traffic need not be documented. How evidence of the concomitant robbery, assault or even planned murder here could be so exacerbating as to render the jury's judgment irrational, we are unable to understand. We are not dealing with minor league addicted street pushers but with well-financed brazen professionals engaged in a large-scale criminal undertaking. in which corruption and violence are endemic. The euphemistic description of these activities as transactions in "contraband" does not disguise the true nature of the wicked alliance here established. Moreover, the trial judge's careful marshaling of the evidence, as we have pointed out, made it clear that the participation of each defendant must be determined by his own actions and not the acts of the others. The jury therefore was capable of determining which defendants had participated in the violence.

### IV. The Wire Taps

The Government was authorized by District Judge Anthony J. Travia, Eastern District of New York, on January 29, 1971 to overhear and electronically record telephone conversations at the home of the defendant Garnett, Bynum's girlfriend; her home was the site of subsequent meetings and cutting operations of the defendants. The order was based on an affidavit stating that four reliable informants had indicated that Bynum was engaged in a large drug distribution business and used Garnett's phone in this business. The affidavit further recited that Bynum had corrupted state and federal officers, that he had a previous narcotics conviction, and that

he was reputed to have caused the killing of some 18 people. The order authorized the wiretap for 20 days and contained the statutory directive (18 U.S.C. § 2518(5)) that the interception of communications be conducted in such a way as to minimize the interception of communications not otherwise subject to interception. On February 12, 1971, a second wiretap was authorized on another phone in the Garnett residence for 20 days duration.[4] The tap on the first phone was extended by Judge Travia on February 18, 1971 until March 3, 1971 so that it expired on the same day as the second tap. For five weeks these phones were monitored and conversations were recorded, eight of which were introduced at the trial and played for the jury. The issuance of the authorization for the wiretap and the recordation of the conversations of some of the defendants has given rise to a number of arguments on appeal.

### A. Authorization and Necessity

■ Appellants claim that the application for the wiretap order was improperly authorized since the application was not approved by the Attorney General or a specially designated Assistant Attorney General as required by statute (18 U.S.C. § 2516(1) ) but rather by an Executive Assistant to the then Attorney General. The precise question has been before this court on several occasions and has been decided adversely to appellants' position, and we are now bound by these precedents. United States v. Becker, 461 F.2d 230, 235–236 (2d Cir. 1972); United States v. Pisacano, 459 F.2d 259 (2d Cir. 1972).[5]

■ It is further urged that the applications for the wiretaps were defective in failing to establish that resort to this means of surveillance was necessary as required by 18 U.S.C. § 2518(1)(c).

---

4. Bynum learned of the first proposed wiretap *before* Judge Travia signed the authorization. He had the second phone installed and the agents learned of this through their tap on the first phone.

5. We note that the federal courts are divided on this question. See United States v. Roberts, 477 F.2d 57 (7th Cir. 1973); United States v. Giordano, 469 F.2d 522 (4th Cir. 1972), cert. granted, 411 U.S. 905, 93 S.Ct. 1530, 36 L.Ed.2d 194 (1973).

A reading of the detailed affidavits which were submitted in support of the wiretap and which form part of this record, indicating reason to believe that Bynum had engaged in the corruption of officials and violence against informants, and that he was a long time narcotics violator, amply supports the issuance of the orders here made.

### B.  *Minimization*

The remand for an evidentiary hearing here was prompted by the argument on the initial appeal in this case that there was a failure by the Government to minimize the interception of innocent conversation on the two telephones tapped at 855 Linden Boulevard, in violation of 18 U.S.C. § 2518(5) which mandates the inclusion of a "minimization" provision in the order authorizing the electronic surveillance.  District Judge Pollack held such evidentiary hearings on April 9, May 10, 11 and 14, 1973.  On June 6, 1973 he filed a 64 page opinion containing findings of fact and conclusions of law, in which he made an exhaustive analysis of the calls which were intercepted, the identity of the conversants, the length of the calls, the actual conduct of the surveillance by the Assistant United States Attorney and the inspectors of the Bureau of Narcotics and Dangerous Drugs (BNDD) and the continuing supervision of Judge Travia, to whom the Government was reporting regularly pursuant to his order.  Judge Travia also appeared as a witness in the hearing before Judge Pollack.  In view of the extensive opinion below, we see no point in repeating the minutiae necessarily developed in the record analyzing the surveillance.

■■  We commence with the observation that the mere fact that every conversation is monitored does not necessarily render the surveillance violative of the minimization requirement of the statute.  See United States v. Cox, 462 F.2d 1293, 1301 (8th Cir. 1972);  United States v. Leta, 332 F.Supp. 1357, 1360 n.4 (M.D.Pa.1971).  It is also obvious that no electronic surveillance can be so conducted that innocent conversation can be totally eliminated.  Before a determination of innocence can be made there must be some degree of eavesdropping.  The record here discloses that out of 2058 completed phone calls, 1277 of them (more than half) were completed in less than 2 minutes.  Since, in a case of such wide-ranging criminal activity as this, it would be too brief a period for an eavesdropper even with experience to identify the caller and characterize the conversation as merely social or possibly tainted, we eliminate these calls from consideration.  See United States v. Sisca, 361 F.Supp. 735, at 744 (S.D. N.Y.1973);  United States v. Focarile, 340 F.Supp. 1033, 1050 (D.Md.), aff'd sub nom., United States v. Giordano, 469 F.2d 522 (4th Cir. 1972), cert. granted, 411 U.S. 905, 93 S.Ct. 1530, 36 L.Ed.2d 194 (1973);  United States v. La Gorga, 336 F.Supp. 190, 196 (W.D.Pa.1971).  Our concern is with the 781 conversations which lasted 2 or more minutes.

■  In determining whether or not these calls were susceptible to minimization, there is patently no mechanical, hard and fast formula applicable.  We look first to determine whether or not the Government could anticipate or, during the course of the surveillance, detect some pattern of innocent conversation which could be eliminated from scrutiny.  The facts and events detailed earlier in this opinion supported the Government's expectation at the time of the initiation of the taps, that Bynum was operating a massive drug business headquartered at 855 Linden Boulevard.  We cannot accept appellants' suggestion that this was just another large drug operation.  The conspiracy here unveiled was not limited to drug peddling, but included larceny, robbery and murder among its ingredients.  The taps were further authorized because Bynum was suspected of corrupting local police as well as federal agents to assure the continuing success of the venture.  Bynum, as we have indicated, was no pedestrian punk or common hoodlum.  He had acted

as an informant for the Government in previous drug cases and was well versed in narcotic investigative techniques. His contacts included not only law enforcement agents but also corrupt attorneys who were suspected of being implicated in the drug operation. He had arrived in New York in modest circumstances at best and within several years, according to his own testimony, had attained a net worth of more than a million dollars and a taxable income in 1971 of $120,000 allegedly on income from "legitimate" businesses, including a clothing store, record shop and the "Kosher" wholesale meat market which he operated with Cordovano (and which, had it not been for the intervention of the authorities, would have been the situs for the murder of Patrolman Wollack).

Even more grotesque is the fact that Bynum testified that through a contact in the Telephone Company, whom he named, he was made aware almost immediately of the existence of both of the taps made on the phones at 855 Linden Boulevard. It is incongruous therefore to advert to an expectation of privacy (Katz v. United States, 389 U.S. 347, 351–353, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)) under circumstances such as these. See United States v. Pui Kan Lam, 483 F.2d 1202, 1205–1206 (2d Cir. 1973). Although Bynum did reside at this address with one of his mistresses (Garnett) and his child, it can hardly be characterized as such a normal domestic menage, that the Government could have anticipated some pattern of orthodox social calls. On the contrary, the reasonable anticipation on the part of the Government, as the court below recognized, was that surreptitious, illegal activity would be conducted on the premises and over the telephone. Furthermore, while natural caution dictates that drug related conversations will be disguised and cryptic, in view of Bynum's awareness of the surveillance, the efforts to obfuscate and confuse the eavesdropper would have been more pronounced than usual.

In view of all of these factors we cannot conceive that either the Assistant United States Attorney or Judge Travia could formulate any detailed screening instructions which could effectively minimize licit telephone interception. The record below establishes that on January 29, 1971, the Assistant United States Attorney and two inspectors of the BNDD submitted to Judge Travia the application for surveillance and personally discussed the breadth of the conspiracy and the difficulties embraced in the surveillance. The record makes it apparent that all were fully aware of the statutory requirements, including the minimization provision and the need to screen out innocent calls. Since it was known that lawyers were suspected of involvement, monitoring agents were specifically instructed not to intercept privileged conversations. The calls were in fact received and monitored but no serious argument is made here that privileged calls were intercepted. For the first time in New York apparently, in view of the charge of corruption, out-of-town BNDD agents, all of the rank of Inspector, were imported to conduct the surveillance and, in order to cope with the jargon anticipated, 2 were assigned in tandem to each tap on a 24 hour basis. Judge Travia moreover insisted upon written reports on a regular basis covering short periods of the tap. In addition to written summaries and detailed logs which were submitted to him on February 4, 8, 16, 18, 24 and March 1 and 8, 1971, there were supplemental meetings and conversations throughout the period of the surveillance. In our view, the degree of judicial supervision is an important factor in determining whether a good faith effort to minimize was attempted. See United States v. Cox, *supra*, 462 F.2d at 1301. We agree with the finding of the court below that the taps were closely and conscientiously supervised by Judge Travia.

The Government maintains that in fact 85% of the conversations recorded were relevant to the authorized investi-

gation. We are, however, unable to determine whether the estimate is accurate. Statistics in this area are properly suspect. What is significant in our view is that appellants' principal contention on appeal on this issue is that some 73 calls of 3 minutes or more duration involved conversations between Bynum's infant's babysitter, Donna, and her friends and classmates which were clearly innocent. The argument is made that in view of the length of the investigation and the pattern of innocence emerging from these calls, they should not have been intercepted.

The Government's contention in response, that although all conversations were recorded only 90% of them were in fact monitored by the agents, is not persuasive. We need not determine, however, whether the interception prohibited by the statute is aural intrusion or mechanical recordation.[6] The difference here between what was monitored and what was recorded is insignificant and in fact not measurable (having been based on one agent's estimate). Assuming arguendo that there was a total interception of all of Donna's calls, we do not find a violation of the statute or any constitutional infirmity in their interception.

Our own examination of the logs supports the contention that Donna's conversations with friends were banal and for the most part devoid of content which would assist the investigation at issue. Of course, in making this retrospective judgment that the Donna calls were innocent, we enjoy the acuity of hindsight. United States v. La Gorga, *supra*, 336 F.Supp. at 196. While such conversations might well commence with teenage trivia, the eavesdropper, unless possessed of the prescience of a clairvoyant, could hardly predict when they might become relevant or when they might be interrupted by an adult with more pressing problems. *Id.* The record in fact reveals that Donna's innocence did not immediately become apparent. Even when it became obvious, Donna was also used to transmit messages and on occasion did reveal the whereabouts of Bynum and the company he was keeping.

Considering all of the circumstances set forth—the broad range of alleged criminality, Bynum's awareness of the taps, the supervision by Judge Travia—we agree with the court below that there was no violation of the minimization requirement of the statute.

## V. OTHER ARGUMENTS

Appellant Bynum argues that he was denied the effective assistance of trial counsel because his trial counsel had at one time represented the Government witness Stewart. Appellant relies

---

6. The court below held, and the Government argues here, that the statutory provision requiring that interceptions of communications be minimized (18 U.S.C. § 2518(5)) was intended to limit only the hearing and not the recordation of conversations. Authority for this view is said to be found in the words of the statute itself. The statute defines "intercept" as "the aural acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). The statute also draws a distinction between interception and recordation in § 2518(8)(a), which requires that the "contents of any . . . communication intercepted by any means authorized by this chapter shall, if possible, be recorded on tape or wire or other comparable device." Any recording made under this subsection is to be "done in such a way as will protect the recording from editing or other alterations." See United States v. Huss, 482 F.2d 38 (2d Cir. 1973).

Appellants respond that the statute was never intended to permit recordation of all conversations. Such a construction would, in their view, allow the Government or anyone else to legally create a tape library of the conversations of any citizen. If such reasoning were applied to the situation of a warrant covering tangible items, seizure of the contents of a whole house would be permissible, in their view, on the ground that to do so would prevent any destruction or disappearance of exculpatory evidence. Appellants contend that this question has been resolved in their favor by earlier cases (United States v. King, 335 F.Supp. 523 (S.D. Cal.1971), rev'd on other grounds, 478 F.2d 494 (9th Cir. 1973); United States v. Leta, 332 F.Supp. 1357, 1360 n.4 (M.D.Pa.1971)).

on a recent decision of this court, United States v. Alberti, 470 F.2d 878 (2d Cir. 1972), cert. denied, 411 U.S. 919, 93 S.Ct. 1557, 36 L.Ed.2d 311 (1973) for the proposition that the trial judge should have conducted a hearing to determine whether or not a conflict exists. Contrary to his present position, the record contains an affidavit by Bynum indicating that he knew of his counsel's representation of Stewart at the beginning of the trial. Although Bynum was represented by two attorneys throughout the trial, no request for a hearing on this question was ever made until after the trial, and then on the basis of newly discovered evidence. It was properly denied by the trial judge. The representation of Stewart by Bynum's trial counsel was in a totally unrelated matter, an assault charge in a state court. There is no prejudice in any event since Stewart was acquitted and any avenue of cross-examination on this point would be fruitless. Moreover, the court below found that trial counsel had represented Bynum in an extremely competent manner. Under these circumstances we find no possible conflict of interest. Olshen v. McMann, 378 F.2d 993, 994 (2d Cir.), cert. denied, 389 U.S. 874, 88 S.Ct. 165, 19 L.Ed.2d 157 (1967).

■ Appellant Birnbaum claims that there was reversible error committed because Stewart referred to the fact that Birnbaum was in jail for several months. The record discloses that the trial judge promptly admonished the jury to disregard and completely erase the remark from their minds. There is no basis for reversal. United States v. Stromberg, 268 F.2d 256, 269 (2d Cir.), cert. denied, 361 U.S. 863, 80 S.Ct. 119, 4 L.Ed.2d 102 (1959).

■ In his "Reply and Supplemental Brief" appellant Altamura urges that the trial judge committed "plain error" in failing to charge the jury on the law and facts in regard to his alibi defense. Having failed to either request such a charge or to make a timely objection in accord with Fed.R.Crim.P. 30, Altamura cannot complain now. Goldsby v. United States, 160 U.S. 70, 77, 16 S.Ct. 216, 40 L.Ed. 343 (1895); Lewis v. United States, 373 F.2d 576, 579 (9th Cir.), cert. denied, 389 U.S. 880, 88 S.Ct. 116, 19 L.Ed.2d 173 (1967); United States v. Tramaglino, *supra*, 197 F.2d at 932.

■ Appellants Mele and Coniglio complain that unique circumstances prevented the latter from testifying at the trial. In June 1971 Coniglio was convicted after a jury trial in the Eastern District of New York, of violating the narcotics laws. On June 15, 1972, this court reversed that conviction because the prosecution had suppressed certain relevant evidence. United States v. Mele, 462 F.2d 918 (2d Cir. 1972). Thus the argument is that had Coniglio testified in the instant April-May, 1972 trial, he would have been subjected to damaging cross-examination about his prior narcotics conviction, a conviction eventually overturned because of prosecutorial misconduct. The fallacy lies in the fact that Coniglio possessed, and failed to exercise, the right to request a prior ruling from the trial judge on whether the earlier conviction could be used on cross-examination. See, e. g., United States v. Palumbo, 401 F.2d 270 (2d Cir. 1968), cert. denied, 394 U.S. 947, 89 S.Ct. 1281, 22 L.Ed.2d 480 (1969). Having neglected to make such an application below, the appellants are now in no position to urge that Coniglio was unfairly prevented from testifying.

■ Levis Nedd, along with some of the other defendants, complains that his in-court identification by Martin Carlin, the victim of the robbery, was the product of an impermissibly suggestive photographic display. Of course, "our inquiry must be whether under all the circumstances [the allegedly improper photographic display] gave rise to a very substantial likelihood of irreparable misidentification . . . . Moreover, in determining whether or not the suggestive photographic identification procedure resulted in misidentification, we may properly consider the other factors which were before the jury and were properly admissible which tend to

establish that there was not substantial likelihood of misidentification." United States ex rel. Gonzalez v. Zelker, 477 F. 2d 797, 801, 803–804 (2d Cir. 1973). Even assuming that the photographic display was impermissibly suggestive, the other evidence against Nedd was so overwhelming that the possibility he was the victim of misidentification is remote in the extreme. Stewart not only testified that Nedd was in on the planning of the robbery, but also related a subsequent conversation in which Nedd graphically described the circumstances surrounding his shooting of Carlin. In addition, when arrested in New Jersey, Nedd possessed jewelry and rings stolen from Carlin as well as an identification taken from another victim of the attempted robbery. See United States ex rel. Springle v. Follette, 435 F.2d 1380 (2d Cir. 1970), cert. denied, 401 U.S. 980, 91 S.Ct. 1214, 28 L.Ed.2d 331 (1971). There was no constitutional infirmity here.

We have considered all arguments urged on us by appellants and find them to be without merit.

Affirmed.