UNITED STATES of America

v.

Michael CLEMENTE, Tino Fiumara, Thomas Buzzanca, Vincent Colluci, Carol Gardner, Michael Copolla, Manuel Castelo, Jr., Joseph Castelo, Castelo & Sons Ship Servicing, Inc., Gerald Swanton, George Zappola, Robert Melli, Defendants.

No. S 79 Cr. 0142 (LBS).

United States District Court,
S. D. New York.

Oct. 11, 1979.

Robert B. Fiske, Jr., U. S. Atty. for the Southern District of New York by Michael S. Devorkin, and Daniel H. Bookin, Asst. U. S. Attys., New York City, for plaintiff.

Paul A. Victor, New York City, for defendant Clemente.

Patricia Costello and Dennis D. S. McAlevy, Hoboken, N. J., for defendant Fiumara.

Gilbert Rosenthal, New York City, for defendant Buzzanca.

Michael Ascher and Dino D. Bliablias, Newark, N. J., for defendant Colucci.

Joseph A. Hayden, Jr., Newark, N. J., and Raymond M. Brown, Jersey City, N. J., for defendants Gardner and Copollia.

Leonard Meyerson, Jersey City, N. J., for defendant M. Castelo, Jr.

John P. Nulty, Newark, N. J., for defendant J. Castelo.

John R. Bartels, Jr., White Plains, N. Y., for defendant Castelo and Sons Ship Service.

James T. Owens, Newark, N. J., for defendant Swanton.

SAND, District Judge.

Defendants have moved to suppress evidence obtained by the Government as the result of electronic surveillance. Two types of electronic surveillance were conducted pursuant to court orders issued under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. sections 2510–2520 (1976): oral surveillance, i. e., "bugging" of the premises, and telephone wiretaps. Defendants' principal legal contention is that the prolonged and extensive scope of the electronic surveillance was of such a nature as to constitute a violation of Title III and the Fourth Amendment.[1] In addition to this contention, with respect to which no evidentiary hearing was sought, defendant Thomas Buzzanca raises the issue of whether the Government sufficiently minimized the Buzzanca oral surveillance. The Court held an evidentiary hearing on the minimization question on August 1, 2, and 6, 1979, and post-hearing briefs were subsequently filed.

We deal herein with issues relating to the scope of the electronic surveillance and the sufficiency of the Government's efforts to minimize the Buzzanca oral surveillance.[2] We have considered and reject miscellaneous other requests made by defendants.

## I. THE SCOPE OF THE SURVEILLANCE

### A. *The Issue*

In a joint memorandum of law in support of motions of defendants Copolla, Colucci, Fiumara and Gardner, the scope of the surveillance issue is expressed as follows:

The principal issue which the moving defendants' electronic surveillance motions

1. The electronic surveillance utilized in this investigation also figures in the case of *United States v. Scotto*, 79 Cr. 032 (CES), and defendants, anticipating that some of these issues would be first raised and resolved in *Scotto*, incorporated by reference in their motions any matter raised by defendants in *Scotto* with respect to these electronic surveillances. It appears, however, that no pretrial challenge has been made in *Scotto* to the electronic surveillance, and at the hearing held on July 11, 1979, defendants acknowledged that there was noth-

ing in those proceedings which was in fact encompassed within their incorporation by reference.

2. A remaining issue relating to electronic surveillance, the alleged failure to make timely disclosure to the Court supervising the Buzzanca surveillance that William Montella had become a cooperating witness, will be dealt with separately following the completion on November 5, 1979, of an evidentiary hearing being conducted on that question.

raise is whether the courts of this country are to give the government a blank check to utilize the incredibly intrusive and privacy shattering tools of electronic surveillance in such an intensive and pervasive manner as to render meaningless both the constitutional protections of the Fourth Amendment and the legislative protections of Title III, 18 U.S.C. sections 2510–2520. This case presents that issue in its starkest form. (Defendants' Memorandum of Law at p. 9).

It is significant that no contention is seriously advanced by defendants that there has not been, except as will be discussed herein, full, complete, literal compliance with all of the numerous and complex requirements of Title III. Thus, no objection is made that there was a lack of probable cause or that the requisite reports were not timely made and filed. It is the cumulative effect of all the various orders to which defendants primarily object.

B. *The Nature of the Surveillance*

To understand and properly evaluate the thrust of defendants' contention, one must first recognize the extent of the relevant electronic surveillance which occurred in connection with the investigations which preceded the indictment herein.

A total of eighteen orders are involved, authorizing oral and wire interceptions at three locations. Orders for the surveillance at each location were issued by three district judges.

The original order and subsequent extensions authorizing the surveillance at Quin Marine Service, Inc., were issued and supervised by Judge Jack B. Weinstein, sitting in the Eastern District of New York. The first QUIN ORAL order was issued on August 25, 1977 and was followed by six extensions (QUIN ORALS II–VII), the last of which was issued on February 22, 1978. In short, the surveillance spanned approximately seven months, with each order covering a thirty-day period. The QUIN WIRE surveillance was authorized by an original order issued on September 29, 1977 and four extensions (QUIN WIRES II–V), the last of which was issued on January 13, 1978. The total length of this surveillance was approximately four and a half months. Each of the orders covered a period of thirty days, except the order issued on December 30, 1977, which was for fifteen days. The Government submitted five-day written reports, as well as copies of the daily logs, to Judge Weinstein throughout the period of surveillance.

Electronic surveillance in the office of defendant Buzzanca, International Longshoremen's Association Locals 1804 and 1804–1, was authorized by orders and extensions issued and supervised by Judge Lawrence W. Pierce, sitting in the Southern District of New York. The original order authorizing oral interceptions (BUZZANCA ORAL), issued on March 7, 1978, was followed by two extensions (BUZZANCA ORALS II–III), each for a thirty-day period. This monitoring covered a three-month time span. The wire interceptions at Buzzanca's office (BUZZANCA WIRE) were authorized by a thirty-day order issued on May 11, 1978 which expired without extension. Five-day reports and daily logs were submitted to Judge Pierce, who supervised the progress of the surveillance.

Judge Vincent P. Buinno, sitting in the District of New Jersey, issued the authorization to intercept wire communications at Castelo and Sons Ship Servicing, Inc. on March 20, 1978 (CASTELO WIRE). This thirty-day order was extended for another thirty days by an order signed on April 20, 1978. Judge Buinno also received five-day reports and daily logs of the surveillance.[3]

3. Defendants' list of the surveillance orders involved in its suppression motion includes orders authorizing interceptions in the offices of Cashin (CASHIN ORAL), ILA Locals 1804 and 1804–1, and interceptions in the offices of Anthony M. Scotto at the International Longshoremen's Association, New York, New York.

The Government has indicated, however, that no defendants were intercepted on the CASHIN ORAL, and no interceptions from that surveillance will be used in this case. Government's Memorandum of Law in Opposition to the Defendants' Motions to Suppress at 3.

All the surveillance orders contained authorization for interceptions concerning the following illegal activities: racketeering, unlawful payment to labor union officials, and unlawful receipt of payment by labor union officials. The QUIN ORALS, QUIN WIRES, and CASTELO WIRE II specified in addition interstate transportation of stolen property. Obstruction of justice and obstruction of a criminal investigation were also included in QUIN ORAL VI, QUIN ORAL VII, and QUIN WIRE V. Interference with commerce by threats or violence was specified in QUIN ORAL VI, QUIN ORAL VII, QUIN WIRE III, IV, and V. The BUZZANCA WIRE and BUZZANCA ORAL III included unlawful embezzlement of assets by labor union officials.

The authorized objective of the surveillance was to determine the identities and roles of all agents, co-conspirators and confederates involved in the enumerated illegal activities and to reveal the methods of operation, nature, scope and details of the criminal activities. Each of the orders specified that the surveillance was to be conducted in "such a way as to minimize the interceptions of communications not otherwise subject to interception" and was to "terminate upon attainment of the authorized objective or, in any event, at the end of thirty days" from the date of the order.

Defendants requested that the Government cause a search to be made of other federal investigating agencies to ascertain whether other electronic surveillance of these defendants, in addition to the electronic surveillance conducted as aforesaid, may have also been conducted under the aegis of the federal government. The Government acquiesced in this request, and a so-called eight-agency search was conducted which disclosed that "the federal government did not conduct any other electronic surveillance of the defendants." [4]

C. *Analysis*

■ In considering the scope of the electronic surveillance here in issue, this Court is very sensitive to the fact that "[f]ew threats to liberty exist which are greater than that posed by the use of eavesdropping devices." *Berger v. New York,* 388 U.S. 41, 63, 87 S.Ct. 1873, 1885, 18 L.Ed.2d 1040 (1967). We approach questions involving electronic surveillance mindful that "[w]herever a man may be, he is entitled to know that he will remain free from unreasonable searches and seizures." *Katz v. United States,* 389 U.S. 347, 359, 88 S.Ct. 507, 515, 19 L.Ed.2d 576 (1967).

■ "[T]he protection of privacy was an overriding congressional concern [in enacting Title III]," *Gelbard v. United States,* 408 U.S. 41, 48, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972), "a comprehensive scheme for the regulation of wiretapping and electronic surveillance." *Id.* at 46, 92 S.Ct. at 2360. This congressional solicitude for the safeguarding of privacy was clearly expressed in the Senate Committee Report on Title III: "Title III has as its dual purpose (1) protecting the privacy of wire and oral communications, and (2) delineating on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized." (S.Rep. No. 1097, 90th Cong., 2d Sess. 66 (1968), *reprinted in* [1968] U.S.Code Cong. & Admin.News, pp. 2112, 2153) [hereinafter cited as Senate Report]. In short, Title III represents an attempt by Congress to establish a system of electronic surveillance subject to rigorous safeguards. *United States v. Tortorello,* 480 F.2d 764, 773 (2d Cir. 1973), *cert. denied,* 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973).

■ Defendants' motion to suppress must fail for a number of reasons. We note that in *Scott v. United States,* 436 U.S. 128, 140, 98 S.Ct. 1717, 1725, 56 L.Ed.2d 168 (1978), in the context of indicating whether proper minimization occurred, the Supreme Court wrote:

---

4. Letter to the Court from Michael S. Devorkin, Assistant United States Attorney, September 7, 1979.

For example, when the investigation is focusing on what is thought to be a widespread conspiracy more extensive surveillance may be justified in an attempt to determine the precise scope of the enterprise. . . .

We believe this reasoning to be sound not only with respect to electronic surveillance once authorized, but with respect to the scope, number and duration of the authorizations themselves.

■ The indictment herein alleges actions by the defendants "to corruptly control and influence the waterfront industry in the Port of New York and other ports in the Eastern United States and to enrich themselves and their associates." [5] The alleged scope of defendants' activities is truly massive. At this stage in the proceedings, we deal solely with the allegations of the indictment and the Government's offer of proof submitted in opposition to defendants' motions to sever.[6] We have and venture no opinion as to the validity of these allegations except to observe that no basis has been offered to question the good faith of the Government in their assertion.

If therefore the scope of permissible surveillance is to be measured in relation to the magnitude of the alleged illegal activity, it must be concluded that no disproportion is present here.[7]

■ In determining that the scope of the electronic surveillance in question did not violate the spirit of Title III and the Fourth Amendment, we have considered certain other factors. Thus, we have looked to the nature of the premises subject to electronic surveillance—offices of Quin Marine Services, Inc., the headquarters of I.L.A. Locals 1804 and 1804–1, and offices of Castelo and Sons Ship Servicing, Inc. Quite clearly, we

are not here dealing with a bug planted in a bedroom or at a political discussion group.

■ Our decision denying defendants' motion is also based on our analysis of the purposes of Title III. We note that in enacting Title III, Congress conceived of electronic surveillance as a means of combating the infiltration of American society by organized crime. The Senate Committee Report indicated that

[o]rganized crime has not limited itself to criminal endeavors. It has large spheres of legitimate business and union activity undermining our basic economic mores and institutions. Senate Report, *supra,* at 2158.

Thus, in dealing with allegations concerning racketeering, corrupt labor practices and other illegal behavior on the waterfront, we are not grappling with some unanticipated or peripheral use of electronic surveillance. The nature of the crimes here alleged is precisely those which Congress envisioned in enacting Title III.

Even more significant than the fact that the electronic surveillance at issue comports with the thrust of Title III is the fact that defendants have made no specific charges alleging violation of those Title III provisions which are designed to ensure that electronic surveillance be used only sparingly. The drafters of Title III, cognizant of the far-reaching impact of electronic surveillance, went beyond the Fourth Amendment protection of probable cause in detailing those requirements which must be met if the Government is to gain judicial approval of applications for the interception of wire or oral communications.

Of the various prerequisites for judicial approval, Congress specified two that are particularly relevant to our consideration of

---

5. Count 1, *Indictment,* 79 Cr. 0142 (LBS) (1979).

6. See opinion of this Court dated July 11, 1979, denying such motions.

7. The Government has frequently asserted, *e. g.* in resisting demands for bills of particulars that, despite the 213 counts in the indictment, this case is a relatively simple one involving

direct cash pay-offs and extortions, many of which have been recorded (presumably by concealed body recorders worn by cooperating witnesses such as William Montella). The fact that an extensive investigation may ultimately result in charges which, though numerous, may be characterized as not complex does not, of course, detract from the magnitude of what is being investigated.

the scope of the electronic surveillance now before this Court. First, Section 2518(1)(c) mandates that each applicant for an order authorizing or approving the interception of a wire or oral communication shall include

a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.

Second, Section 2518(1)(e) requires that surveillance applications contain

a full and complete statement of the facts concerning all previous applications known to the individual authorizing and making the application, made to any judge for authorization to intercept, or for approval of interceptions of, wire or oral communications involving any of the same persons, facilities or places specified in the application, and the action taken by the judge on each such application.

■ It is evident that both Sections 2518(1)(c) and 2518(1)(e) reflect a respect for privacy on the part of the drafters of Title III. The former section helps to assure that electronic surveillance does not become a routine tool in criminal investigations. See *United States v. Kahn*, 415 U.S. 143, 153 n.12, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974); *United States v. Giordano*, 416 U.S. 505, 515, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974). The latter provision assures that in making determinations as to the appropriateness or necessity of electronic surveillance, the courts will not be acting in a vacuum. Rather, Section 2518(1)(e) enables courts to consider surveillance requests with knowledge of the scope of prior surveillances, and to assess each surveillance application in a cumulative context. Thus, Section 2518(1)(e) protects against the very kind of unwarranted invasion of privacy by the cumulative effect of separate authorizations of which defendants now complain. Defendants, however, have not specifically alleged any violation of either this provision or 2518(1)(c).

■ Of course, the same protection which the Fourth Amendment extends to the political dissident, *United States v. United States District Court*, 407 U.S. 297, 314, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972), is also afforded the alleged waterfront extortionist. We suggest no other implication. We conclude, however, that absent some specifically identified violation of the provisions of Title III, the number and duration of the court authorized and supervised electronic surveillances now before this Court do not in and of themselves violate either the letter or the spirit of Title III or the Fourth Amendment. The defendants' motion is in this respect denied.

## II. MINIMIZATION

Defendant Buzzanca's motion to suppress evidence obtained pursuant to orders permitting the interception of oral communications at the offices of ILA Locals 1804 and 1804-1 ("the BUZZANCA ORALS")[8] is based on the contention that the evidence was acquired in violation of the "minimization" requirement of Title III. Section 2518(5) of Title III provides:

Every order . . . shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter

. . . .

Defendant Buzzanca asserts that the manner in which the orals were executed resulted in unnecessary monitoring and recording of nonpertinent conversations in violation of Section .2518(5) and urges that all intercepted conversations be suppressed under 18 U.S.C. Section 2518(10)(a). For the reasons hereinafter stated, defendant Buzzanca's motion is denied.

Buzzanca claims that the monitoring agents would listen and record two minutes of nonrelevant matter; turn off the monitoring equipment for one minute and then listen and record for the ensuing two minutes. This 2:1:2 "spot monitoring" proce-

---

8. See page 5 *supra.* "BUZZANCA ORALS" signifies the original order and the two subsequent extensions.

dure conducted pursuant to instructions given the monitoring agents by the Assistant United States Attorney in charge of the investigation, Michael S. Devorkin, is said to have resulted in the recording of four out of every five minutes of conversation when Buzzanca was in his office, including conversations which Buzzanca contends were transparently irrelevant.[9] The Government disputes Buzzanca's computation, arguing that "in any period of time which includes full cycles of interception and non-interception, that is a pattern of 2:1:2:1, one-third of the time there is no interception." (Government's Reply Memorandum in Opposition to Buzzanca Motion, at page 2).[10]

The Government has submitted extensive memoranda, affidavits and logs concerning its minimization efforts. No challenge on this ground has been made by any other defendant.

 "Section 2518(5) was designed to prevent improper invasions of the right of privacy and to curtail the indiscriminate seizure of communications." *United States v. DePalma*, 461 F.Supp. 800, 817 (S.D.N.Y. 1978). "A court should not admit evidence derived from an electronic surveillance order unless . . . it is left with the conviction that on the whole the agents have shown a high regard for the right of privacy and have done all they reasonably could to avoid unnecessary intrusion." *United States v. Tortorello*, 480 F.2d 764, 784 (2d Cir.), *cert. denied*, 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 36 (1973).

 To determine whether the Government has complied with minimization requirements, we look to several guiding principles. First, we note that the mere number or percentage of nonpertinent calls intercepted does not require a finding that statutory minimization standards have been violated. *Scott v. United States*, 436 U.S. 128, 140, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1977). Indeed, before the Supreme Court construed 2518(5) in *Scott*, it was held that the fact that every conversation is monitored does not necessarily render the surveillance violative of minimization requirements. *United States v. Hinton*, 543 F.2d 1002, 1012 (2d Cir. 1976), *cert. denied sub nom. Carter v. United States*, 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1977); *United States v. Bynum*, 485 F.2d 490, 500 (2d Cir. 1973), *vacated on other grounds*, 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974), *later reinstated*, 513 F.2d 533 (2d Cir. 1975), *cert. denied*, 423 U.S. 952, 96 S.Ct. 357, 46 L.Ed.2d 277 (1975).

 Secondly, the court should evaluate the reasonableness of the Government's minimization efforts not with the benefit of hindsight, but in light of the circumstances existing at the time of the interceptions. *Scott v. United States, supra*, 436 U.S. at 140, 141, 142, 98 S.Ct. 1717; *United States v. Bynum, supra*, 485 F.2d at 502. Thus, it has been recognized that "[i]t is virtually impossible to completely exclude all irrelevant matter from intercepted conversations." *United States v. Schwartz*, 535 F.2d 160, 164 (2d Cir. 1976), *cert. denied*, 430 U.S. 906, 97 S.Ct. 1175, 51 L.Ed.2d 581 (1977).

 Third, in determining whether the Government properly minimized, the court should consider the circumstances of the surveillance. *Scott v. United States, supra*, 436 U.S. at 140, 98 S.Ct. 1717. Thus, the court should examine the extent of the alleged crime under investigation, the nature of the conversations being monitored, the relationship among the parties being monitored, the number of persons present and

---

9. The BUZZANCA ORALS involved a total of 3723 interceptions on 57 days of monitoring. Of these, 3006 involved actual conversations. Of these, 118 lasted more than two minutes. Government's Memorandum of Law in Opposition to the Defendants' Motions to Suppress at 47. The Government alleges that of the 118 conversations which lasted more than two minutes, 25 (or less than 1% of all conversations) were definitely nonpertinent. *Id.*

10. While the Government denies automatic or mechanical utilization of the 2:1:2:1 procedure, since the logs indicate that for certain periods of time this pattern in fact existed, we assume for the purposes of the following discussion that when Buzzanca was in his office, this was the monitoring procedure followed.

the ease with which patterns of relevance can be ascertained. *Id.* at 140–142, 98 S.Ct. 1717.

 After considering the above principles, we conclude that the Government utilized proper minimization in executing the Buzzanca Orals. In upholding the monitoring of nonpertinent conversations, we point to several key factors. We note that there was substantial supervision by the supervising attorney and that the agents were made fully aware of the requirements of minimization. We also take account of the fact that the electronic surveillance at issue was directed at a widespread criminal conspiracy, and that the orals were located in an area used by a central member of the alleged conspiracy. Moreover, we observe that it was difficult to establish patterns of nonpertinency or innocence. Many conversations were ambiguous, guarded or in code. Oral conversations often took place in low tones and at the same time that other conversations in the office occurred or with background noise. Some speakers were "one-time only," and many conversations were short and changed subject rapidly.

We conclude that there was no failure to minimize the Buzzanca Orals, and deny defendant Buzzanca's motion to suppress on this ground.

So ordered.