UNITED STATES of America,
Plaintiff-Appellee,

v.

George HARRIS, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

LeRoy SILVERSTEIN, also known as
LeRoy Sterling, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Leo RUGENDORF and Larry Rosenberg,
Defendants-Appellants.

Nos. 15765–15767.

United States Court of Appeals
Seventh Circuit.

Dec. 13, 1967.

Rehearings Denied Feb. 14, 1968.

**374**

Anna R. Lavin, Chicago, Ill., for LeRoy Silverstein.

Frank Oliver, Chicago, Ill., for Leo Rugendorf.

Melvin B. Lewis, Chicago, Ill., for Larry Rosenberg.

Maurice J. Walsh, Chicago, Ill., for appellants Leo Rugendorf and Larry Rosenberg.

Julius Lucius Echeles, Jo-Anne F. Wolfson, Frank Oliver, Chicago, Ill., for appellant George Harris.

Jack M. Levin, Chicago, Ill., for Leo Rugendorf.

Edward V. Hanrahan, U. S. Atty., Sheldon Davidson, Chicago, Ill., for appellee.

John Peter Lulinski, Gerald M. Werksman, Lawrence Jay Weiner, Asst. U. S. Attys., of counsel.

Before DUFFY, Senior Circuit Judge, CASTLE and FAIRCHILD, Circuit Judges.

DUFFY, Senior Circuit Judge.

Defendants were charged in a 13-count indictment. The first count charged a conspiracy to defeat the Bankruptcy Act, Title 18 U.S.C. § 152, and the Dyer Act, Title 18 U.S.C. § 2312. In the second count, the defendants were charged with a substantive violation of the Interstate Extortion Act, Title 18 U.S.C. § 1951. Various of the defendants were charged singly or together with one or more of the other defendants in counts 3 through 13 with substantive violations of the Bankruptcy Act, Title 18 U.S.C. § 152.

The jury found all of the defendants not guilty as to count 2 which charged violation of the Interstate Extortion Act.

The jury recommended that defendant Harris be given leniency as to count 1. However, the trial judge sentenced Harris to five years imprisonment and $10,000 fine which was the maximum punishment under Title 18 U.S.C. § 371. In addition, defendant Harris was also sentenced to five years on count 5 to run consecutively with count 1, making a total sentence of ten years. The judge also sentenced Harris to several other five-year terms to be served concurrently.

The other counts of the indictment will not be detailed here. Suffice it to say they charged concealment of funds or other property of the bankrupt, and with conspiracy to do so in violation of the Bankruptcy Act, Title 18 U.S.C. § 371.

Defendants George Harris and LeRoy Silverstein (sometimes known and often referred to as LeRoy Sterling or Sterling) were officers and principal stockholders of Sterling-Harris Ford, Inc., Chicago, Illinois, which had a Ford agency and sold new and used cars. They were financed by Associates Discount Corporation of South Bend, Indiana, a finance company which "floor-planned"

the automobiles by means of trust certificates which vested in Associates, an unrecorded first lien.

In 1960, the business of the Agency was good due, in large part, to heavy newspaper and television advertising. However, the Company could not meet all of the advertising costs which had accumulated, and the advertising was cancelled. During February 1961, sales of automobiles were greatly reduced.

On March 1, 1961 Sterling-Harris had two hundred ten automobiles on which Associates held trust certificates. The total amount due to Associates by reason of the trust certificates was approximately $430,000.

The testimony disclosed that business of the Company was slow up to Friday, March 3, 1961. Starting about 4 p. m. on that day, many people came to the premises to buy automobiles. They came mostly in small groups. Some came by taxicab. When the people were approached by salesmen, most of the "customers" said they wanted to see Mr. Sterling. Several asked to see Mr. Harris. Many of the customers milled around the showroom floor waiting for either Silverstein or Harris to take care of them. All sales of automobiles were for cash.

Defendant Leo Rugendorf was present greeting customers. He previously had visited Sterling-Harris Ford, Inc. two or three times a week during January and February of 1961. After greeting customers, Rugendorf took them to Sterling's office. Rugendorf was heard telling customers "Mr. Sterling needed the money and the customer needed a car."

Silverstein remained in his office writing out bills of sale to the customers. When they left Silverstein's office, Rugendorf took them into the rear service area from which the customers drove off in new Ford vehicles.

The sale of motor vehicles, as hereinbefore described, continued on March 3, 1961 from 4 p. m. to 9 p. m. None of the salesmen of the Company was able to make any sales or to discuss possible orders.

On Saturday, March 4, 1961, customers again began coming into the agency. If approached by a salesman, they would say "We are waiting to see the boss," or "I would like to see Mr. Sterling," or "We are taken care of."

Rugendorf arrived about 9 a. m. on March 4th and remained for the entire day. He again introduced customers to Silverstein who busied himself all day in his office with customers and writing out bills of sale. Business was so heavy that Silverstein didn't go out to lunch. After the customers left Silverstein's office with bills of sale in their hands, Rugendorf took them into the rear service area from which the customers drove off in new Ford motor vehicles.

On Saturday, Harris was also in his office busy with customers. When the customers left his office, they walked into the service area and drove off in new automobiles.

The sale of motor vehicles as described continued all day Saturday and also on Sunday, March 5, 1961, except that on Sunday, neither Rugendorf nor Rosenberg was observed at the showrooms at 2626 North Cicero Avenue, Chicago, Illinois.

On Monday morning, March 6, 1961, the showroom and the lot on Cicero Avenue were empty of automobiles.

On Friday, March 3, 1961, Sterling caused a corporate check of $10,000 to be cashed. On Monday, March 6, 1961, two additional corporate checks each in the amount of $10,000 were caused to be cashed by Sterling and Harris. On the same morning the cash in the cashbox on the premises contained less than $200.

On March 10, 1961, Silverstein received a check payable to the corporation in the amount of $25,000. This was from the landlord and was for surrendering the showroom premises and the lease. The sum represented a security deposit with the landlord.

The $25,000 check was deposited on March 10, 1961 in a Sterling-Harris Ford, Inc. special account. The deposit was entered as of March 13, 1961. The

$25,000 deposit was transferred on March 13, 1961 to the Attorney Korem Special Account. Korem wrote a check on this account to Silverstein in the amount of $7500 dated March 15, 1961, and one dated March 20, 1961 in the amount of $7500 to George Harris. Each check was endorsed by the respective payee.

Out of the balance of $10,000, $5,000 was paid to Attorney Brown and $5,000 was paid to the Trustee in Bankruptcy. However, after turnover proceedings and civil litigation regarding the turnover orders, Harris and Silverstein each delivered $7500 to the Trustee.

On Tuesday, March 7, 1961, Harris was seen driving near a number of automobiles which were on a lot near Park City and Waukegan, Illinois. These cars had been driven there during the night of Sunday, March 5, 1961, from the Sterling-Harris automobile warehouse on Fullerton Avenue, Chicago. The arrangements to transport the cars were made by one Casey Swieringa and government witnesses Hamphton and Lipken. Swieringa was an auctioneer for one Bembinster who owned an automobile auction at Wausau, Wisconsin.

On Monday, March 6, 1961, all four defendants were in a room in the Schroeder Hotel in Milwaukee, Wisconsin. By pre-arrangement, they were to meet Swieringa and some men who would buy the automobiles wholesale. Swieringa came into the room with Bembinster and the latter's clerk. Bembinster spoke of buying the one hundred fifteen automobiles for $115,000, but upon learning the cars were financed, expressed concern that he could not obtain good title. Bembinster had spoken with Attorney Thompson who represented Thorpe Finance Company, which company was supposed to finance the deal.

Bembinster told the group that the "Finance Man" would not approve the transaction and the deal was off. Bembinster then left the hotel and went to the airport where he saw defendants Rugendorf, Rosenberg and Silverstein. Harris was not present. Rugendorf and Rosenberg proposed that they go into partnership with Bembinster and sell the cars at auction, dividing the proceeds.

On Tuesday, March 7, 1961, Associates took possession of the one hundred twelve cars on the lot at Park City, Illinois. Involuntary bankruptcy proceedings were filed on March 13, 1961. Silverstein was questioned by the Receiver-Trustee concerning the automobiles or the money received from the sale thereof, but he did not answer the questions. Neither Harris nor Silverstein informed the Receiver-Trustee in Bankruptcy where any of the corporate cash or books were located.

All defendants complain of the form of the indictment claiming a misjoinder of counts 1 and 2, and alleged multiplicity as to counts 3 through 13.

Rule 8(a), Federal Rules of Criminal Procedure, provides that "Two or more offenses may be charged in the same indictment * * * if the offenses charged * * * are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan." We hold that the trial court did not err when it refused to dismiss the indictment for misjoinder of counts 1 and 2.

The writer of this opinion thinks a different situation is presented with reference to counts 3 to 13 in that they were duplicitous, and that the Government should have been required to elect. However, a majority of the panel thinks otherwise, and such is the holding of this Court.

The author of this opinion is of the view that the correct rule is stated in Edwards v. United States, 265 F.2d 302 (9 Cir., 1959) where the Court held that the fact that several items of property belonging to the estate of the bankrupt were concealed, does not multiply the offenses, and that the Government should have been required to elect.

All of the defendants strongly urge that the trial court erred in the instructions given to the jury and in the manner in which the Court responded to the ju-

ry's inquiries as to what some of the instructions meant.

The last day of the trial was, apparently, tiring for the jury. They sat through a full day's session which included closing arguments by five counsel. They sat, after the evening meal, and listened to lengthy instructions by the Court which lasted to about 11 p. m. The instructions required some three hours for delivery. Sixty pages of the appendix are required to set forth the instructions given. Under the circumstances, it is understandable that the Court might have spoken rapidly.

The following day the jury sent a communication to the judge which said:

"Your Honor—

"The jury requests to know if on count one of the indictment:

"(1) If a defendant is guilty of one act, does this make him guilty of the entire Count?

"(2) Must each defendant be found guilty *or* innocent or may one or more be guilty & the remaining be innocent?

"(3) If all must be found to be guilty because of (1), is there some way the jury can request leniency for one or more defendants?"

Some of the defendants requested the Court to answer Yes or No to each question, but the Court declined to do so.

Later, on the same day, another question was sent to the Court by the Jury:

"In a conspiracy charge does participation in *one* act make one guilty of all charges—Your Honor your instructions were so rapid we did not understand *this particular law.*"

The trial court decided to reread the instructions which it had previously given as to conspiracy and to which the defendants had vigorously objected. These reread instructions omitted all definitions of the terms including "intent to defraud," and no reference was made to the presumption of innocence and the standard of proof required for conviction.

The jury continued its deliberations, and on the afternoon of the same day,

sent a third request for advice from the judge—"The jury, as a last request, asks for reinstruction on the Extortion Law as pertaining to count 2 of the indictment, if permissible."

The Court proceeded to read the Government's approved instructions on the subject, but omitted all of the defense-approved instructions, stating "I read the ones that I think are sufficient."

We think it was inevitable that the instructions as originally given and the supplemental instructions were such as to confuse the jury. As was stated in Powell v. United States, 347 F.2d 156, 158 (9 Cir., 1965)—" 'When a jury makes explicit its difficulties a trial judge should clear them away with concrete accuracy.' * * * A rereading of a portion of that charge which was not clearly responsive to the jury's inquiry could scarcely have clarified the matter in the jurors' minds. Clearly error occurred, requiring reversal."

We hold error was committed in the manner in which the instructions were given, and in the Court's response to the questions asked by the jury.

Craig Phelps, who was Receiver-Trustee of the bankrupt estate, was asked, as a witness at the trial, whether during the bankruptcy proceedings he questioned *either* Sterling or Harris about the missing cars, the money represented by the missing cars, or the corporate books of the bankrupt. Over objections, he answered that he had questioned Sterling, but that "he did not answer me." There is no testimony that Phelps questioned Harris. Phelps testified that Harris did not inform him as to the location of the corporate property or books.

Title 11 U.S.C. § 25(a) (10) provides that at certain bankruptcy hearings * * * and at such other times as the court shall order * * * [the bankrupt] shall submit to an examination concerning * * * the amount, kind and whereabouts of his property * * * but no testimony given by him shall be offered in evidence against him in any criminal proceeding, except such testi-

mony as may be given by him in the hearing upon objections to his discharge * * *." The lack of response or answer to which Phelps referred was not given upon a hearing of objections to discharge. This statute has been held applicable where an individual is required to perform the duties of a corporate defendant, United States v. Castellana et al., 349 F.2d 264, 274 (2 Cir. 1965).

Thus, the Court permitted the jury to receive evidence that Harris and Silverstein remained silent when interrogated during the bankruptcy proceedings in connection with matters about which they were later indicted. Phelps was an officer of the Bankruptcy Court. Title 18, U.S.C. § 152 provides that concealment from persons charged with the control or the custody of property belonging to a bankrupt estate, is an offense.

Defendants Harris and Silverstein rely on the recent case of Garrity et al. v. State of New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967). In Garrity, police officers were compelled to testify before a state investigatory proceeding upon pain of dismissal from their jobs. Their testimony was used as the basis of subsequent criminal accusations and conviction. The Supreme Court, in reversing the convictions, stated the fear of being discharged on the one hand and the fear of self-incrimination on the other was " * * * 'a choice between the rock and the whirlpool' which made the statements products of coercion in violation of the Fourteenth Amendment."

Also pertinent is United States v. Bufalino, 285 F.2d 408 (2 Cir., 1960), where a conviction, based on defendant's silence alone was reversed.

The author of this opinion believes it was error to permit the Receiver-Trustee to testify that Harris and Silverstein remained silent when he questioned Silverstein, not only for the reasons stated, but also because it was a violation of defendants' Fifth Amendment right against self-incrimination. See Griffin v. State of California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). However, a majority of the panel thinks otherwise for the reasons stated by Judge Fairchild in his concurring opinion, and such is the decision of this Court.

It is the view of the author of this opinion that further error was committed when Government counsel read to the jury from Exhibit 74, the voluntary petition in bankruptcy, that part which contained allegations of fraud and concealment. The Government knew that there was no opportunity of confrontation or cross-examination by the defendants. Judge Fairchild's opinion states it was admitted to prove that Sterling-Harris Ford was a bankrupt. However, the adjudication of bankruptcy was available but was not used. The error was not cured by the Court's subsequent instructions. However, a majority of the panel finds nothing wrong with such trial tactics or, at least, holds that no error was committed in that respect, so that determination is the decision of this Court.

The writer of this opinion is of the view that the trial court was in error in suggesting before the jury that errors committed at the trial could be corrected by the Court of Appeals. In United States v. Fioriti, 300 F.2d 424, 427, 5 A.L.R.2d 968 (7 Cir., 1962), this Court, in an opinion by Judge Castle, held a similar reference to be prejudicial, stating: "Such dilution of the final responsibility of the jury as was thus inferred as permissible to the jury in its determination of the verdict is prejudicial to a defendant."

However, a majority of the panel does not regard the remark as to the Court of Appeals as error, and such will be the decision of the Court in this case.

Several of the defendants have assigned additional errors. Due to the unfortunate length of this opinion, we shall discuss but one of these.

Defendant sought to suppress as evidence, the documents referred to in counts 3 and 4 of the indictment. Defendants contend this evidence was the result of an illegal search and seizure by FBI agents Bassett and Ross at Apex Fibers, Inc. (Apex), 865 Sangamon

Street, Chicago, on May 16, 1961. The room from which the records were taken was used by defendant Silverstein as an office. The trial court denied the motion to suppress on the ground that Silverstein had no standing to make the motion. In this ruling, we hold the trial court was in error.

Apparently the trial court's decision was based on the belief that Silverstein had no proprietary interest in the premises searched. This decision overlooks uncontradicted facts. Silverstein testified that the Apex office was his, and his alone. Agent Ross admitted that the room searched was Silverstein's office. Government witness Goldman testified that Silverstein was in charge of Apex.

Since Silverstein had standing to make the motion to suppress, we hold that his co-defendants also had standing. This ruling is based on the overwhelming prejudice that would result if the evidence were inadmissible as to Silverstein but admissible as to his co-defendants. This Court so held in United States v. Thomson, 113 F.2d 643, 646, 129 A.L.R. 1291 (7 Cir., 1940). See also: Takahashi v. United States, 143 F.2d 118, 122 (9 Cir., 1944); Nelson v. United States, 93 U.S. App.D.C. 14, 208 F.2d 505, 514 (1953); McDonald et al. v. United States, 335 U. S. 451, 456, 69 S.Ct. 191, 93 L.Ed. 153 (1948).

As stated in Brady v. State of Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963) "Society wins not only when the guilty are convicted but when criminal trials are fair * * *."

In view of the several errors which we have hereinbefore described, we are forced to the conclusion that the defendants herein did not have a fair trial.

The judgments of conviction are reversed, and the causes remanded for further proceedings.

Reversed and remanded.

FAIRCHILD, Circuit Judge (concurring).

I concur in reversal for the reason stated in part numbered 1, below. My conclusions on other points appear in parts numbered 2 through 7.

██ 1. *The instructions and the court's responses to questions by the jury.* I agree that in the area of instructions, the conduct of the trial fell below the standards of clarity required for a fair trial by jury. I have little doubt of defendants' guilt, but they have a right to a jury trial which fulfills the usual standards.

██ 2. *Counts 3 and 4.* These counts involved records, i. e., documents relating to the property or affairs of the bankrupt. Count 3 charged concealment of records, both before the bankruptcy proceeding, in contemplation thereof, and after the proceeding was filed. Fraudulent concealment, in contemplation of a proceeding or after filing, is an offense described by the seventh paragraph of 18 U.S.C. sec. 152. Count 4 charged withholding of the records from the receiver and trustee. Fraudulent withholding from these officers after filing is an offense described by the eighth paragraph of 18 U.S.C. sec. 152. Obviously concealment of records after the filing, and withholding them from the officers, approach being one and the same offense, though described in different paragraphs. But in my opinion, concealment before and after filing, on the one hand, and withholding from officers after filing, on the other, are sufficiently distinct to be treated as separate offenses. It is true that Count 3 unnecessarily alleged concealment "from the officers of the bankruptcy court to be appointed and appointed". This surplusage did not, in my opinion, mislead, nor render the counts duplicitous.

██ 3. *Counts 5 through 13.* Each of these counts involves a separate transfer of an item or group of items of property of the bankrupt. Counts 5, 7, 9, and 11 charged Silverstein (and, in several instances, Harris) with transfer and concealment of certain property in contemplation of a bankruptcy proceeding and with intent to defeat the bankruptcy laws. Such transfer and concealment is an offense described by the sixth para-

graph of 18 U.S.C. sec. 152. Each transfer is a distinct offense,[1] and the counts are not duplicitous.

■ Counts 6, 8, 10, 12, and 13 charged Silverstein or Harris (both in 6 and 10) with concealment of certain property from the receiver and trustee. The first paragraph of sec. 152 makes it an offense fraudulently to conceal from the officers of the court "any property belonging to the estate of a bankrupt". In Edwards v. United States [2] the ninth circuit decided that concealment under this paragraph was but one offense, regardless of the number of items of property concealed or the number of transactions effecting the concealment. In the case at bar, the court did not require the government to elect the count upon which it would proceed, but the court did consolidate the counts and instruct that there was but a single offense of concealment, whether of one or more different sums of money. If *Edwards* be correct, then, in my opinion, the solution of the problem by the district court was adequate.

■ 4. *Testimony that Silverstein and Harris were silent.* Silverstein or Harris or both were asked by the receiver in an interview in his office where certain assets were. Their silence was an incident of the continuing concealment. They claimed no privilege against self-incrimination. Under these circumstances, I consider the receiver's testimony that they did not answer admissible.

■ 5. *Government Exhibit 74.* The petition was offered, and properly admitted, to prove that Sterling-Harris Ford, Inc. was a bankrupt, i. e., a debtor against whom a petition had been filed.[3] The government read a paragraph of it to the jury after counsel for two defendants read other portions and said he was omitting that paragraph. It is not clear that under the circumstances the reading was unfair, and the court did instruct the jury that the statements in the petition

should not be treated as true and correct, that it was not received in evidence for that purpose, but to show the beginning of the bankruptcy.

■ 6. *Reference to Court of Appeals.* The trial judge in colloquy with defense counsel, correcting an erroneous response to an objection, said:

"The Court: Oh it is. I am sorry. I was thinking—I am in error. The Court is in error. You do not have to go to the Court of Appeals to find it out in this instance. My order is in error, the order is reversed. * * *"

This offhand reference can hardly suggest to the jury that an error made by it can be corrected by the reviewing court. United States v. Fiorito [4] has been clearly distinguished, and does not control a case where the remark was not addressed to the jury and was similar in portent to the remark above quoted.[5]

7. *Denial of motion to suppress.* A search warrant was obtained and certain records were seized under it. In showing probable cause for the warrant, the agents relied on their observation of these records in a certain office. The issue is whether the agents were lawfully on the premises where they saw the records.

■ I agree that the district judge erred in denying the motion to suppress on the ground that defendant Silverstein had no proprietary interest in the premises searched. The next question, which is in dispute and which the district judge did not resolve, but which he should be left free to answer on retrial, is whether the agents were lawfully on the premises when they first noticed the presence of the records.

CASTLE, Circuit Judge (concurring).

I concur in a reversal of the judgments of conviction, and I join with Judge FAIRCHILD in his concurring opinion.

1. Dranow v. United States (8th Cir. 1962), 307 F.2d 545, 559.

2. (9th Cir. 1959), 265 F.2d 302, 306.

3. 18 U.S.C. sec. 151.

4. (7th Cir. 1962), 300 F.2d 424.

5. United States ex rel. Witherspoon v. Ogilvie (7th Cir. 1964), 337 F.2d 427, 431–432.