**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**Rogelio QUINTANA et al.,
Defendants-Appellants.**

**Nos. 71–1609 to 71–1611.**

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 3, 1974.

Decided Jan. 13, 1975.

Rehearing Denied Feb. 26, 1975.

Allan A. Ackerman, Sherman C. Magidson, Frederick F. Cohn, Chicago, Ill., for defendants-appellants.

James R. Thompson, U. S. Atty., Gary L. Starkman and William J. Schilling, Asst. U. S. Attys., Chicago, Ill., for plaintiff-appellee.

---

* The Honorable Donald P. Lay, United States Circuit Judge of the Eighth Circuit at Omaha, Nebraska, is sitting by designation.

** The Honorable Robert A. Grant, United States Senior District Judge for the Northern District of Indiana, is sitting by designation.

Before SWYGERT, Chief Judge, LAY, Circuit Judge,* and GRANT, Senior District Judge.**

LAY, Circuit Judge.

Defendants Leonides D. Suarez, Rogelio Quintana and Gilberto Alonso appeal from their convictions on various counts of narcotics offenses and conspiracy to distribute narcotics, in violation of 18 U.S.C. § 2; 21 U.S.C. § 174, and 26 U.S.C. § 4705(a). They were convicted by a jury in 1971 in the Northern District of Illinois, the Honorable Bernard M. Decker presiding. We affirm the judgments of conviction of Leonides Suarez and Gilberto Alonso. We reverse the judgment of conviction of Rogelio Quintana on the ground that there is insufficient evidence to sustain the government's burden of proof.

The evidence at trial may be briefly summarized. The investigation which led to defendants' arrest began in Chicago in February 1970, when the Bureau of Narcotics and Dangerous Drugs (BNDD) was informed about a group importing large quantities of heroin and cocaine for distribution in this country. Agents Dominic Petrossi and Harry Fullett assumed undercover roles as underworld figures. In this capacity, the agents flew to Miami to meet with other members of the conspiracy[1] on February 25, 1970, to arrange delivery of drugs to Chicago. On the next day, 1400 grams of high-grade cocaine were delivered to the agents in Chicago by a courier who was then followed to defendant Suarez's apartment building.

As the investigation proceeded, suspicion centered on Suarez's clothing store as the Chicago hub of the operation. In April 1970, the persons with whom the agents had previously dealt invited the agents to come to the store to meet with

1. In all, fifteen persons were indicted on a total of eleven counts. Some defendants were severed before trial and the indictments against them were dismissed on the government's motion. Two pled guilty. A directed verdict of not guilty was entered as to one, two were acquitted by the jury, and the three appellants were found guilty.

Suarez. The agents did so and Suarez offered to supply heroin at $25,000 per kilo. He also admitted having held the cocaine sold to the agents on February 26 prior to its delivery to them. Thereafter, the agents continued to purchase kilogram amounts of heroin and cocaine from the group.

On May 18, 1970, Chief Judge Robson of the Northern District of Illinois authorized a wiretap for twenty days on two phones, one at Suarez's home and the other at his clothing store. This order was later extended for fifteen days.

Thereafter the agents discussed further sales with Suarez, but no drugs were delivered until June 18, when the agents purchased a half kilo of heroin from defendants Suarez and Alonso. The same day, the agents arranged to purchase four kilos of cocaine from Alonso. On June 20, Suarez took the agents to a Chicago motel where they paid Alonso $40,000 in exchange for the cocaine. Petrossi then admitted other BNDD agents who arrested Suarez and Alonso.

All three defendants were convicted of conspiracy. Suarez was also convicted on eight substantive counts for drug sales on February 26, May 23, June 18, and June 20. Alonso was convicted on four substantive counts for the June 18 and 20 sales. On appeal, they challenge the use of wiretap evidence on the grounds that the tap was improperly authorized within the Justice Department and was conducted without any attempt to minimize interception of innocent conversation, in violation of Chief Judge Robson's order and the Fourth Amendment. Suarez also claims that (1) the agents illegally coerced him into the May and June sales, (2) that there is no proof of his knowledge of importation of the cocaine, and (3) that the trial court failed to answer the jury's questions properly. Defendants Alonso and Quintana challenge the sufficiency of the evidence connecting them with the conspiracy.

*Wire Interceptions*

The wiretap in this case was authorized in May 1970. An extension was granted in June 1970. Subsequent to trial, it was disclosed that these wiretaps were approved during the period that then-Attorney General Mitchell's executive assistant, Sol Lindenbaum, approved taps whenever the Attorney General himself was unavailable, in violation of 18 U.S.C. § 2516(1). This court remanded the case to the trial judge, the Honorable Bernard Decker, on April 6, 1972, for a further evidentiary hearing on the authorization procedure used in the instant case.

On the basis of affidavits from Mitchell, Lindenbaum, Henry Peterson and a letter from Mitchell to Will Wilson, the Assistant Attorney General for the Criminal Division, Judge Decker on December 15, 1972, found that Mitchell had personally authorized the original application and that Sol Lindenbaum had authorized the extension order. Subsequently, the Supreme Court held, in United States v. Chavez, 416 U.S. 562, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974), that if a wiretap was in fact approved by the Attorney General, then suppression would not be required merely because the application indicated that Wilson rather than Mitchell was the authorizing official. *Id.* 416 U.S. at 565, 94 S.Ct. 1849. In a companion case, United States v. Giordano, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974), the Court held that suppression was required where Lindenbaum rather than the Attorney General had given the authorization. *Id.* 416 U.S. at 508, 94 S.Ct. 1820. The government concedes that in light of *Giordano,* the extension order is invalid. The question remaining, therefore, is the validity of the original wiretap, which Judge Decker found Mitchell had personally approved.

Defendants argue that the evidence is insufficient to support the finding below that Mitchell personally authorized this wiretap application. First, they argue that the Fifth Circuit has, since the

hearing on remand, found a closely related tap to be invalid due to approval by Lindenbaum rather than Mitchell. United States v. Robinson, 472 F.2d 973 (5th Cir. 1973) (en banc). Second, defendants now claim that without a statement from Mitchell himself to the effect that he personally reviewed the application in question, the evidence is insufficient to support the finding below.

First, defendants are clearly mistaken if their contention is that the taps found invalid by the Fifth Circuit in *Robinson* were the same as those with which we are concerned. The *Robinson* taps were on phones in Miami, rather than Chicago, and the requesting officers, authorization dates and supporting affidavits differ materially from those involved here. In *Robinson*, Lindenbaum's affidavit admitted that he, rather than Mitchell, reviewed the requests. In the present case, according to Lindenbaum's affidavit, the request to tap the Chicago phones was reviewed by Mitchell himself on May 14, 1970. We conclude that *Robinson* is not controlling.[2]

Defendants likewise challenge the sufficiency of the affidavits as a statement of what part Mitchell took in approving the application. It is true that in *Cha-vez*, Mitchell's affidavit did assert that he had personally authorized the tap. United States v. Chavez, 478 F.2d 512, 514 (9th Cir. 1973), rev'd, 416 U.S. 562, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974). Defendants urge that the instant case is the *only* one in which Mitchell's own affidavit failed to detail his participation, if any, in the particular wiretap in question. On the contrary, at least four circuits have upheld wiretaps where the Attorney General's personal participation was proved, as here, through the affidavit of Lindenbaum and a Mitchell-initialed memorandum to Assistant Attorney General Wilson. *See, e. g.,* United States v. Brick, 502 F.2d 219 (8th Cir. 1974); United States v. James, 161 U.S. App.D.C. 88, 494 F.2d 1007, 1016–1018 (1974); United States v. Fiorella, 468 F.2d 688, 690 (2d Cir. 1972), cert. denied, 417 U.S. 917, 94 S.Ct. 2622, 41 L.Ed.2d 222 (1974); United States v. Ceraso, 467 F.2d 647, 650–651 (3d Cir. 1972); United States v. Cox, 462 F.2d 1293 (8th Cir. 1972), cert. denied, 417 U.S. 918, 94 S.Ct. 2623, 41 L.Ed.2d 223 (1974). In each of these cases, Mitchell either filed no affidavit at all, or, as here, his affidavit failed to state what part he played in authorizing the challenged wiretap. In each case the court nevertheless found

---

**2.** The defendants argue that the fact that Agent Petrossi's supporting affidavit was dated May 18, 1970, rather than May 14, 1970, throws such doubt on the authenticity of the other documents dated May 14 that a further evidentiary hearing is needed. They argue that this indicates the instant tap received Justice Department approval on the 18th of May, the same day as the tap invalidated in *Robinson*. Since Sol Lindenbaum apparently approved wiretaps only when Mitchell was out of town or otherwise unavailable, a showing that two taps were approved the same day and that one had been approved by Lindenbaum might suggest that Lindenbaum in fact approved both.

The fact that the investigating agent's affidavit was notarized on May 18, 1970 (the date the Justice Department filed the application in the district court in *Chicago,* where Agent Petrossi was stationed), rather than on or before May 14, 1970 (the date the Attorney General reviewed the application in *Washington*), is not conclusive. The applica-ble statute, 18 U.S.C. § 2510 *et seq.,* details what affidavits must be presented to the district court *after* the Attorney General or a specifically designated Assistant Attorney General determines that a tap is necessary. 18 U.S.C. § 2518. However, the statute does *not* state *what* the Attorney General must review when deciding to allow an application to be presented to a district court. 18 U.S.C. § 2516. Lindenbaum's affidavit notes that the "proposed affidavit" was reviewed by the Attorney General. The record does not show whether it was signed at that time. The Justice Department complied with the statute when it presented Agent Petrossi's affidavit, duly notarized, to the district court on May 18, 1970. Since Mitchell *could have* properly reviewed this wiretap on May 14, 1970, even if Petrossi did not sign his affidavit until May 18, the discrepancy in the dates merely reflects on the credibility of the subsequent affidavits. *Cf.* United States v. Brick, 502 F.2d 219, 222 n.7 (8th Cir. 1974).

sufficient proof of Mitchell's personal review of the application.

*Chavez* did not require any particular form of proof of Mitchell's involvement. Lindenbaum's affidavit would not be insufficient under normal rules of evidence merely because Mitchell himself could have, but failed to, testify as to his part in reviewing this application. The affidavits of Lindenbaum and Mitchell show that Lindenbaum had the opportunity to observe how each application was handled, whether he or Mitchell actually authorized a particular tap. That showing of personal observation of the events to which he testifies makes Lindenbaum a competent witness. C. McCormick, Evidence § 10 (2d ed. 1972); 2 J. Wigmore, Evidence § 478 (3d ed. 1940). Thus, Judge Decker's reliance on the proof in the district court was not error.

### The Invalid Extension Order

■ The government concedes that the June 10, 1970, order extending the wiretap for 15 days is invalid under United States v. Giordano, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974). Eleven conversations intercepted thereunder were used at trial, only three of which are independently admissible.[3] The government urges that the error in admitting the other eight conversations is harmless because the independently obtained evidence of guilt was overwhelming.

The record shows that the great majority of the evidence admitted at trial was obtained prior to and without reliance upon the improperly authorized extension. The 124-day investigation culminating in defendants' arrest began in February 1970. Suarez sold heroin and cocaine to Agent Petrossi on two occasions before the invalid extension. Only the last ten days before defendants were arrested were tainted by the illegal extension order issued June 10, 1970. Of the eleven counts in the indictment, only the first, the conspiracy charge, and counts 8–11 were based in any part on events occurring during the extension period. None of the evidence used at trial on counts 2–7[4] was derived from the extension order.

The untainted evidence in support of Counts 1 and 8–11 was substantial. Counts 8 and 9 involve delivery by Suarez and Alonso of a half kilogram of heroin to BNDD Agents Petrossi and Fullett on June 18, 1970, at Suarez's clothing store. Defendant Suarez was well known to the agents due to prior narcotics sales. Both Petrossi and Fullett testified to the sale, and three other BNDD surveillance agents corroborated this with oral and photographic evidence. Counts 10 and 11 related to the sale by Alonso and Suarez of 4 kilograms of cocaine to the agents at a motel on June 20, 1970, the date defendants were arrested. The negotiations setting up this sale were conducted on June 18 at a meeting of the four at Suarez's store. Again, the two agents were the principal

---

**3.** Three of the eleven conversations intercepted under the extension order are admissible regardless of the government's failure to follow the statutory authorization procedures. This is because Agent Petrossi was a party to three of the conversations whose interception he had requested. Judicial authorization is unnecessary in such a case, for the statute provides:

> It shall not be unlawful under this chapter [18 U.S.C. §§ 2510–2520] for a person acting under color of law to intercept a wire or oral communication, *where such person is a party to the communication* or one of the parties to the communication has given prior consent to such interception.

18 U.S.C. § 2511(2)(c) (emphasis added). This provision does not offend the Fourth or Fifth Amendments, for one has no constitutionally protected expectation that the person to whom he voluntarily reveals incriminating information will keep it secret. *See* United States v. White, 401 U.S. 745, 751, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971); Hoffa v. United States, 385 U.S. 293, 302, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); United States v. Warren, 453 F.2d 738 (2d Cir.), cert. denied, 406 U.S. 944, 92 S.Ct. 2040, 32 L.Ed.2d 331 (1972); United States v. Koska, 443 F.2d 1167 (2d Cir.), cert. denied, 404 U.S. 852, 92 S.Ct. 92, 30 L.Ed.2d 92 (1971).

**4.** Only Suarez among these appellants was charged in Counts 2–7. Those counts charged Suarez and others later severed from the trial with selling and facilitating the sale of large quantities of heroin and cocaine to Agent Petrossi on February 26 and May 23 in 1970.

witnesses and other surveillance agents also testified. The overall conspiracy charge involved all the meetings and acts charged in the individual substantive counts. Of the eighteen overt acts alleged in furtherance of the conspiracy, only the last three occurred during the extension period, and all of these concerned meetings of the various defendants in Chicago, rather than telephone calls.

 Under these circumstances, the eight conversations admitted in error were merely cumulative to the great weight of other evidence, and no leads prejudicial to the defendants were obtained from the illegal tap. We conclude that the tainted evidence could not reasonably have affected the verdict. *See* United States v. Nasse, 432 F.2d 1293, 1303 (7th Cir. 1970), cert. denied, 401 U.S. 938, 91 S.Ct. 927, 28 L.Ed.2d 217 (1971).[5]

 Defendant Alonso asserts that the doctrine of harmless error is inapplicable to unauthorized wire interceptions. We disagree. Harmless error has been recognized in constitutional violations. Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). It has been applied by this circuit where there have been violations concerning search and seizure. *Cf.* United States v. Nasse, *supra.* We think the rule is applicable here. The sales were arranged prior to the interceptions. Alonso's involvement in Counts 9, 10 and 11 arose from his direct sales to Agents Petrossi and Fullett on June 18 and 20. The challenged interceptions affecting Alonso, in our judgment, did not affect the substantial rights of the parties and were harmless beyond a reasonable doubt.

*Minimization*

Defendants urge that the taps must be suppressed because the government failed to comply with that portion of the wiretap order which required that the taps be conducted so as to "minimize the interception of communication not otherwise subject to interception." It is undisputed that during the 20 days of the original wiretap and during the extension as well, government agents monitored and recorded *all* incoming and outgoing calls on the phones at Suarez's clothing store and his home. Some 2000 calls were intercepted, while only 153 were ultimately found germane enough to be worth transcribing, and only 47 were used at trial.

The minimization provision is based on a statutory requirement that every wiretap order shall so provide. 18 U.S.C. § 2518(5). Three courts of appeals have held that interception of *all* calls for periods of twenty days or more under judicial authorization does not necessarily violate the order, the statute, or the Fourth Amendment, even when a high percentage of the monitored conversations contain no evidence of criminal conduct. United States v. James, 161 U.S.App.D.C. 88, 494 F.2d 1007, 1018 (1974); United States v. Manfredi, 488 F.2d 588, 599–600 (2d Cir. 1973), cert. denied, 417 U.S. 936, 94 S.Ct. 2651, 41 L.Ed.2d 240 (1974) (of 1595 calls monitored, only 150 were possibly pertinent); United States v. Bynum, 485 F.2d 490, 500 (2d Cir. 1973), vacated on other grounds, 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974); United States v. Cox, 462 F.2d 1293, 1300 (8th Cir. 1972), cert. denied, 417 U.S. 918, 94 S.Ct. 2623, 41 L.Ed.2d 223 (1974).

These decisions view the statute's minimization command as requiring a case-

---

**5.** Suarez asserts in addition that the use at trial of conversations of his wife Marion, who was acquitted by the jury, was illegal since she was not named in the judicial order authorizing taps. It is now well settled that a wife's conversations may properly be intercepted pursuant to an order naming her husband and "others as yet unknown." United States v. Kahn, 415 U.S. 143, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974), rev'g 471 F.2d 191 (7th Cir. 1972). The application must specifically identify only those persons whom law enforcement officials have probable cause to believe are committing the offense for which the wiretap is sought. *Id.* 415 U.S. at 155, 94 S.Ct. 977. On the basis of *Kahn,* we reject Suarez's contention.

by-case analysis of the reasonableness of a particular interception. As the District of Columbia Court of Appeals has observed:

> The congressional reports accompanying the wiretap statute and decisions interpreting 18 U.S.C. § 2518(5) make it clear that the minimization standard, like the standards traditionally applied to the determination of probable cause, is one of reasonableness which must be ascertained from the facts of a given case.

United States v. James, 161 U.S.App. D.C. 88, 494 F.2d 1007, 1018 (1974).

■ A number of factors are relevant to determining whether, in a particular case, the government has done all that it could to avoid unnecessary intrusion. The first consideration is the nature and scope of the criminal enterprise under investigation. Large and sophisticated narcotics conspiracies may justify considerably more interception than would a single criminal episode. This is especially so where, as here, the judicially approved purpose of the wiretap is not so much to incriminate the known person whose phone is tapped as to learn the identity of the far-flung conspirators and to delineate the contours of the conspiracy. United States v. James, 161 U.S. App.D.C. 88, 494 F.2d 1007, 1019 (1974); United States v. Cox, 462 F.2d 1293, 1301 (8th Cir. 1972).

Another important factor is the government's reasonable expectation of the contents of particular calls:

> If at the time of the initiation of the wiretap the government knows those persons who are suspected of the criminal offense, it can tailor its minimization efforts to avoid monitoring incoming or outgoing calls involving other persons; similarly, if the government knows during what time of the day the telephone will be used for criminal

activity, it can avoid intercepting calls at other times. These considerations affect the initial minimization tactics employed by the government, but agents may expand or contract their interception policy as the wiretap continues. . . .

United States v. James, *supra* 494 F.2d at 1020.

Where the government does not at the outset have reason to believe that any identifiable group of calls will be innocent, then it may be reasonable to monitor all calls for some time. If the agents learn from this initial total interception that there is a pattern of innocent conversations, then they should cease eavesdropping on that group during the remainder of the tap. *Cf.* United States v. Focarile, 340 F.Supp. 1033 (D.Md.), aff'd sub nom. United States v. Giordano, 469 F.2d 522 (4th Cir. 1972), rev'd on other grounds, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974).

To state that agents must seek a method of separating innocent from incriminating conversations is not to say that such a pattern will always be identifiable. The problem is that

> " . . . it is often impossible to determine that a particular telephone conversation would be irrelevant and harmless until it has been terminated.

> . . . . .

> It is all well and good to say, after the fact, that certain conversations were irrelevant and should have been terminated. However, the monitoring agents are not gifted with prescience and cannot be expected to know in advance what direction the conversation will take."

United States v. Cox, 462 F.2d 1293, 1301 (8th Cir. 1972), *quoting* United States v. LaGorga, 336 F.Supp. 190, 196 (W.D.Pa. 1971).[6]

---

6. Narcotics conspiracies present special problems along this line, because the participants are often sophisticated enough to use a code to veil with innocence the most relevant conversations. *See* United States v. James, 161 U.S.App.D.C. 88, 494 F.2d 1007, 1019 (1974);

United States v. Bynum, 485 F.2d 490, 501 (2d Cir. 1973), vacated on other grounds, 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974); United States v. Cox, 462 F.2d 1293, 1300–1301 (8th Cir. 1972); United States v. Sisca, 361 F.Supp. 735, 744 (S.D.N.Y.1973);

Even if a pattern of innocent calls is identified,

> [i]t is obvious . . . that no electronic surveillance can be so conducted that innocent conversations can be totally eliminated. Before a determination of innocence can be made there must be some degree of eavesdropping. [If many calls are of very short duration] in a case of such wide-ranging criminal activity as this, it would be too brief a period for an eavesdropper even with experience to identify the caller and characterize the conversation as merely social or possibly tainted . . . . .

United States v. Bynum, 485 F.2d 490, 500 (2d Cir. 1973), vacated on other grounds, 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974).

A third important consideration is the authorizing judge's continuing supervision. The statute permits but does not require the judge to ask for interim reports from the investigating agents setting out the progress to date and the need for further interception. 18 U.S.C. § 2518(6). Where the judge has required and reviewed such reports at frequent intervals, courts have been more willing to find a good-faith attempt to minimize unnecessary interceptions. *See, e. g.,* United States v. James, 161 U.S.App. D.C. 88, 494 F.2d 1007, 1021 (1974); United States v. Bynum, 485 F.2d at 501; United States v. Cox, 462 F.2d at 1301; United States v. Focarile, 340 F.Supp. 1033, 1048 (D.Md.), aff'd sub nom. United States v. Giordano, 469 F.2d 522 (4th Cir. 1972), rev'd on other grounds, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974). *See also* United States v. Kahn, 471 F.2d 191 (7th Cir. 1972), rev'd, 415 U.S. 143, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974).

In the instant case the purpose of the tap was to learn the identity of Suarez's suppliers and customers in his narcotics business. There were many potential defendants and the government had no reason to expect that any particular group of calls would be innocent. Some of the defendants were husband and wife (Marion and Leonides Suarez, and Rogelio Quintana and Linda Ramirez Quintana). Others were close friends. Thus, their conversations often included innocent social matters as well as material relevant to the investigation. *Cf.* United States v. James, 161 U.S.App. D.C. 88, 494 F.2d 1007, 1022–1023 (1974). The difficulty of identifying what was relevant and what was not was increased by the use of codes and often, by use of colloquial Spanish rather than English. Thus, only after translation could the agents evaluate the conversations. Chief Judge Robson, prior to giving his authorization, was advised of some of these difficulties. He limited the initial tap to 20 rather than the statutory maximum of 30 days. He required, and received, reports from Agent Petrossi at five-day intervals throughout the tap.

■ Under these circumstances we find that the government has made a *prima facie* showing of reasonableness, and that the burden is shifted to the defendants to suggest what alternative procedure would have better minimized interception of noncriminal conversation while still permitting the government to achieve its legitimate objectives. United States v. Manfredi, 488 F.2d 588, 599–600 (2d Cir. 1973), cert. denied, 417 U.S. 936, 94 S.Ct. 2651, 41 L.Ed.2d 240 (1974); *see also* United States v. Fino, 478 F.2d 35, 37 (2d Cir. 1973), cert. denied, 417 U.S. 918, 94 S.Ct. 2623, 41 L.Ed.2d 223 (1974). The defendants have made no such suggestion. Under these circum-

United States v. Focarile, 340 F.Supp. 1033, 1048 (D.Md.), aff'd sub nom. United States v. Giordano, 469 F.2d 522 (4th Cir. 1972), rev'd on other grounds, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974).

> Another technique often found is the use of guarded language or the deliberate discussion of irrelevant matters during the early moments of a conversation so that, if the conversations are being monitored, agents, assuming the call to be innocent, will cease the interception. *See* United States v. Bynum, 360 F.Supp. 400, 412–413 (S.D.N.Y.), aff'd, 485 F.2d 490 (2d Cir. 1973).

United States v. James, *supra* 494 F.2d at 1019–1020.

stances, we hold that the interceptions in this case did not exceed the district court's authorization or the statute.

*Statutory Presumption Under § 174*

■ Suarez asserts that the evidence is insufficient under former title 21 U.S.C. § 174[7] to show that he had knowledge that the cocaine in the February 26 sale had been illegally imported. This contention is without merit.

In Turner v. United States, 396 U.S. 398, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970), the Supreme Court set aside a conviction under § 174 on the ground that possession of 15 grams of a 5% cocaine mixture could not support the statutory presumption of knowledge of importation.[8] The Court found that since some cocaine is legally produced within this country and is then stolen, there is sufficient possibility of domestic origin of small quantities of cocaine that neither importation nor knowledge thereof may be presumed merely from the fact of possession.

However, *Turner* specifically reserved for another day the question of whether the presumption could constitutionally be applied where large quantities of cocaine are involved. *See* 396 U.S. at 419 n. 39, 90 S.Ct. 642. The Second and Fifth Circuits have since held the presumption available to the prosecution when the quantity of cocaine possessed is so large (usually 800 grams or more) that a domestic origin is highly unlikely. *See, e. g.,* United States v. Mather, 465 F.2d 1035 (5th Cir.), cert. denied, 409 U.S. 1085, 93 S.Ct. 685, 34 L.Ed.2d 672 (1972); United States v. Jiminez, 444 F.2d 67 (2d Cir. 1971); United States v. Gonzalez, 442 F.2d 698 (2d Cir. 1970) (en banc), cert. denied sub nom. Ovalle v. United States, 404 U.S. 845, 92 S.Ct. 146, 30 L.Ed.2d 81 (1971). These decisions are based on the fact that the total amount of domestically produced cocaine stolen annually averages less than 6000 grams, and the average individual theft is 9 grams or less. The improbability that Suarez's 1400 grams (involved in the February 26 sale) came into his hands through more than 100 individual thefts speaks for itself. In such a case, the failure of the trial judge to instruct the jury that the presumption is available only where large amounts of the drug are present is harmless error. United States v. Gonzalez, 442 F.2d at 709 n. 10.

*Entrapment and Coercion*

The trial court submitted Counts 6–11 relating to the sales on May 23, June 18 and June 20 to the jury. Suarez asserts that a judgment of acquittal should have been entered since the government agents Petrossi and Fullett entrapped or coerced him into the three drug sales which occurred after May 12. Suarez's basic defense is that notwithstanding proof of his predisposition to commit the crime, the government's conduct was so shocking that the prosecution should be barred. In United States v. Russell, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), Mr. Justice Rehnquist reviewed the history of entrapment and the Supreme Court reaffirmed the doctrine of Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958), and Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932). The principal issue under the entrapment de-

---

**7.** Title 21 U.S.C. § 174 provided:

Whoever fraudulently or knowingly imports or brings any narcotic drug into the United States or any territory under its control or jurisdiction, contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of any such narcotic drug after being imported or brought in, knowing the same to have been imported or brought into the United States contrary to law, or conspires to commit any of such acts in violation of the laws of the United States, shall be imprisoned

. . . . .

Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of the narcotic drug, such *possession shall be deemed sufficient evidence to authorize conviction* unless the defendant explains the possession to the satisfaction of the jury. (Emphasis added.)

The section was repealed on October 27, 1970.

**8.** *See* note 7 *supra.*

fense is the defendant's predisposition to commit the crime.[9] As Mr. Justice Rehnquist stated:

> [E]ntrapment is a relatively limited defense. It is rooted not in any authority of the Judicial Branch to dismiss prosecutions for what it feels to have been "overzealous law enforcement," but instead in the notion that Congress could not have intended criminal punishment for a defendant who has committed all the elements of a prescribed offense, but was induced to commit them by the government.

United States v. Russell, 411 U.S. 423, 435, 93 S.Ct. 1637, 1644 (1973).

Russell did not rule out the possibility that some governmental conduct might be so shocking that prosecution would be barred as a matter of due process. Mr. Justice Rehnquist specifically noted that

> . . . we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction . . . .

Id. at 431–432, 93 S.Ct. at 1643.

However, such law enforcement conduct would have to be violative of " 'fundamental fairness, shocking to the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment." Id. at 432, 93 S.Ct. at 1643.[10]

In the instant case, the undercover agents played the roles of an Italian underworld gangster (Petrossi) and his bodyguard (Fullett). On May 12, Suarez and one Angel Arias sold the agents what was supposed to be a kilo of heroin for $21,000. Field tests showed, however, that the substance was not a narcotic at all. The agents returned to Suarez's store at 4:30 that afternoon, and continued in their roles as criminals who had been cheated. Petrossi held Suarez by the collar and told him to give him back the $21,000 or produce some narcotics or "somebody would get hur." Suarez told them that Arias had taken the money, but Suarez promised to work something out. Other persons, friends of Suarez, were present, and they assured the agents that Suarez could be trusted in drug dealing. The agents left the store without further incident. Subsequently Petrossi called Suarez several times a week to arrange for further

---

9. On the facts of this case, the jury clearly could have found that defendant Suarez was predisposed to sell heroin and cocaine to the agents, since he had done so on February 26 and agreed to continue doing so long before the alleged coercion began. As indicated, Suarez does not claim total lack of predisposition.

10. In Russell, undercover narcotics agents had approached the defendants, illegal manufacturers of methamphetamine ("speed"), and offered to supply a necessary ingredient in exchange for half of the output. That ingredient could legally be sold, but was somewhat difficult to obtain since the BNDD had persuaded several chemical supply firms to cease selling it. Defendants agreed and used the undercover agents' proffered supplies to make more speed, which was delivered to the agents.

The Court specifically rejected the argument that the deceit necessarily involved in undercover work was impermissible in those circumstances:

> The illicit manufacture of drugs is not a sporadic, isolated criminal incident, but a continuing, though illegal, business enterprise. In order to obtain convictions for illegally manufacturing drugs, the gathering of evidence of past unlawful conduct frequently proves to be an all put impossible task. Thus in drug-related offenses law enforcement personnel have turned to one of the only practicable means of detection: the infiltration of drug rings and a limited participation in their unlawful present practices. Such infiltration is a recognized and permissible means of investigation; if that be so, then the supply of some item of value that the drug ring requires must, as a general rule, also be permissible. For an agent will not be taken into the confidence of the illegal entrepreneurs unless he has something of value to offer them. Law enforcement tactics such as this can hardly be said to violate "fundamental fairness" or "shocking to the universal sense of justice,"

. . .

United States v. Russell, 411 U.S. 423, 432, 93 S.Ct. 1637, 1643 (1973). Accord, Lewis v. United States, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966); United States v. Pingleton, 458 F.2d 722 (7th Cir. 1972).

drug transactions, and Suarez continued to deal with him, negotiating over prices, etc. Suarez was involved in three more sales to the agents before his arrest.

██ The agents assumed the roles of mobsters and their reaction when they were "cheated" was to act like mobsters. Under the circumstances, we do not find their conduct so "shocking" or "outrageous" as to bar prosecution under *Russell*. Appellant Suarez does not claim that the agents pointed a gun at him or hit him. When they left his store, Suarez did not go into hiding or consult the authorities to seek protection. Instead, he continued to deal with the agents. A lesser reaction on the agents' part might have aroused the suspicion of the defendants, endangering the investigation and perhaps the agents as well.[11]

*Jury Instructions*

Suarez's last challenge relates to the alleged failure of the trial judge to make a prompt response to the jury's request for a definition of the words "entrapment" and "coercion." The jury retired to consider its verdict at noon on June 10, 1971. The district judge advised counsel that he would leave the courthouse at about 5 p. m., and would not return until 9:30 a. m. the next morning, unless the jury reached a verdict before 10 p. m. About 6 p. m. counsel learned that the jury requested further instructions, and the marshal relayed the request to the judge between 7 and 8 p. m. that night. The judge apparently had the marshal tell the jury to continue deliberating until they heard from him, so they continued until 10:15 p. m. About 9 a. m. the next morning, deliberations were resumed. Defense counsel then moved for a mistrial due to the long delay in answering the request for instructions. The motion was denied, and the court, with consent of counsel, then re-read the instructions previously given on the defense of entrapment and coer-

cion. This occurred about 10:30 a. m. Twenty minutes later, the jury reached its verdict.

Suarez does not complain that the instructions given were incorrect, but rather that allowing the jury to remain in some confusion on those defenses for five hours of deliberation was prejudicial error where entrapment and coercion were the principal grounds of his defense. The cases on which he relies, however, all based reversal on the fact that the supplemental instructions there given were *incorrect* and *not responsive* to the question. Bollenbach v. United States, 326 U.S. 607, 66 S.Ct. 402, 90 L.Ed. 350 (1946); United States v. Harris, 388 F.2d 373, 377 (7th Cir. 1967); Powell v. United States, 347 F.2d 156, 158 (9th Cir. 1965).

██ The ultimate test is whether the procedure as a whole was so likely to have confused the jury that reversal is required. *Cf.* Powell v. United States, *supra* 347 F.2d at 158. We hold that it was not. First, the instructions ultimately given were correct and favorable to the defense. Second, the fact that only those instructions, rather than the full charge in this complex case, were re-read would help clarify the matter. Third, the jury was not under great pressure to terminate its deliberations. After the jury heard the supplemental instructions, the jurors continued to deliberate for twenty minutes. The verdict they reached was consistent with the overwhelming weight of the evidence.

*Defendant Alonso*

Defendant Alonso was charged and convicted on Count 1 of conspiracy, and Counts 9, 10 and 11 with narcotics sales on June 18 and 20, 1970. Alonso was not shown to have been involved until June 17, 1970, when he was present at Suarez's clothing store along with Suarez, Rodolfo Ricano[12] and Ricano's wife.

---

11. Under the circumstances, we likewise reject the complaint that Counts 1–3 should have been severed from Counts 6–11 because of the alleged government misconduct tainting the latter counts.

12. Ricano was indicted with appellants herein on nine of the 11 counts. He pled guilty to the indictment. Mrs. Ricano was not indicted.

The two agents met with Suarez in the back of the store to discuss the purchase of cocaine and heroin. Suarez told the agents that the person in the front room (referring to Alonso) could supply heroin and agreed to negotiate with him on the agents' behalf.

The next day, June 18, the agents went to the store where Alonso participated in the sale by getting the half-kilo of heroin from his car and giving Petrossi a sample. After Petrossi approved, Alonso gave him the rest of the heroin and was paid $11,500 for it. Suarez got $400 for his part as middleman. Then the agents and Alonso discussed the purchase of 4 kilos of cocaine, upon which they agreed. About 1 p. m. on June 19, the agents went to see Suarez to arrange for the sale, and Suarez said that he and Alonso would dilute the 4 kilos into 6 for delivery the next day.

On June 20, the agents met Suarez at his store, and he took them to a motel room where they found Alonso and 4 kilos of cocaine. Agent Fullett discussed with Alonso the possibility of getting 5 or 6 kilos of cocaine or heroin every two or three months, and Alonso said he could supply that. Then they discussed the manufacture and importation of cocaine, which Alonso said he smuggled into the United States from South America. Petrossi paid Alonso and Suarez $40,000 for the drugs, and then he let other agents into the room to arrest the defendants.

Defendant Alonso urges that reversal is required due to the use of telephone conversations intercepted under the invalid extension. As previously discussed we reject this contention. He also claims that the evidence as a matter of law showed more than one conspiracy, so that it was an abuse of discretion for the trial judge to deny his motion for severance.

■ The evidence here of a single conspiracy to sell narcotics was strong, and the fact that federal agents did not discover Alonso's part in it until near the end of the investigation does not negate his part in it. The evidence showed that Alonso was working with Suarez and Ricano, parties who had previously delivered drugs to the agents. In their presence, he negotiated and carried out further sales to those agents.

■ While Alonso may not have participated in all the prior sales, that does not necessarily mean that more than one conspiracy was involved. The problem is essentially one of agreement, the essence of conspiracy. As this court said in United States v. Varelli, 407 F.2d 735 (7th Cir. 1969):

> The agreement may continue for a long period of time and include the performance of many transactions. New parties may join the agreement at any time while others may terminate their relationship. The parties are not always identical, but this does not mean that there are separate conspiracies. See Developments in the Law—Criminal Conspiracy, 72 Harv.L. Rev. 920, 922–935 (1959).

*Id.* at 407 F.2d 742.

■ The government proved a single continuing conspiracy to import heroin and cocaine into the United States, principally through Miami, and then to distribute it in Chicago through Suarez, Ricano and Alonso. Alonso participated with Ricano and Suarez in two sales, and was aware of Suarez's prior dealings with Petrossi. In joining with Suarez and Ricano to negotiate drug sales to the agents, he made himself part of their single conspiracy. The trial judge properly denied the motion for severance.

*Defendant Quintana*

The defendant Quintana was charged and convicted only under the conspiracy count. We find the evidence insufficient to sustain his conviction.

Quintana was the godson of defendant Suarez. He did frequent Suarez's clothing store, and occasionally bought jewelry from Suarez to sell on a door-to-door

basis. The only evidence which the government submitted to bind Quintana to the drug conspiracy was his presence in the store on two occasions when the narcotics were discussed and two telephone conversations with Suarez. This evidence may be summarized as follows:

(1) On June 16, Quintana was present when the other defendants and the agents telephoned Escandar in Miami. Quintana was 5 to 10 feet away, took no part in the call, and there is no evidence that he could hear it.

(2) On June 18, Quintana was present in the *front* room of the store while drug negotiations were conducted behind closed doors in the *rear* of the store. At one point, Suarez came out of the back and told Quintana to go buy some Chivas Regal, which he did.

(3) On May 19, 1970, Suarez called Quintana to ask if he had "an eight" to loan. Quintana, thinking that Suarez wanted money, replied, "I don't have eight hundred dollars." When Suarez made it clear that he referred to narcotics, Quintana said: " . . . I never want to . . . I don't want to get involved."

(4) On May 24, Quintana talked to Suarez and said that he had just come in from horseback riding, and then may have admitted that he had some heroin in his possession. Suarez said he would possibly talk to him about it in a week or so, but no transaction was otherwise discussed.

█ At oral argument, the government conceded that the two occasions of Quintana's mere presence in the vicinity of illegal narcotics dealings were insufficient to prove that defendant had agreed to or actually participated in the conspiracy. As the Sixth Circuit stated in United States v. Webb, 359 F.2d 558, 562 (6th Cir.), cert. denied, 385 U.S. 824, 87 S.Ct. 55, 17 L.Ed.2d 61 (1966), " . . . neither association with conspirators nor knowledge that something illegal is going on by themselves constitute proofs of participation in a conspiracy." *Accord,* United States v. Falcone, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940); Diaz-Rosenado v. United States, 364 F.2d 941 (9th Cir. 1966); *cf.* United States v. Kelton, 446 F.2d 669 (8th Cir. 1971).

The government further conceded that the May 19 telephone conversation (in which Quintana first misunderstood Suarez's reference to drugs and then, when he did understand, clearly refused to become involved) cannot reasonably be understood as showing his intention to agree to join the narcotics conspiracy. Thus, the government's case against Quintana actually must rest on the relevant parts of the May 24 conversation:

F. Suarez: Is, what are you doing?

Nino (Quintana): Nothing, (I) came back a little while ago from horseback riding.

Suarez: And what you have nothing right?

Nino: Eh?
Suarez: Have you anything?
Nino: Eh? of what?
Suarez: Of that.
Nino: Of which?
Suarez: Of the other.
Nino: Of.
Suarez: Horse.
Nino: Yeah I have, what for?

Suarez: Here right, no because if not that, you know in about eh six or eight days I, well I talk to you.
Nino: O.K.

The government urges that the reference to horseback riding meant that Quintana had been out dealing in heroin, since "horse" is a common slang term for heroin. However, the unrefuted testimony of a riding stable owner showed that Quintana and his wife had in fact been out riding horses that morning.

After the reference to horseback riding, Suarez asked, "Have you anything?" allegedly meaning heroin. Again, Quintana misunderstood, so Suarez had to

specify "horse." Quintana answered "Yes." Viewing this evidence most favorably to the government, it must be assumed that Quintana admitted *possession* of heroin. However, no transaction with Suarez or the others was shown to have been consummated or even discussed further than indicated in this conversation, even though all calls were monitored until June 20 except for one 2-day period, and Suarez's store was under surveillance during the same period.

■ That Quintana may have possessed heroin and had the *opportunity* to join Suarez's conspiracy is not sufficient proof that Quintana did agree to participate in a scheme to import and distribute large quantities of drugs. *See, e. g.,* United States v. Jensen, 462 F.2d 763 (8th Cir. 1972); Causey v. United States, 352 F.2d 203 (5th Cir. 1965); United States v. Ford, 324 F.2d 950 (7th Cir. 1963). There is no showing of an agreement to advance any common interest. In United States v. Varelli, 407 F.2d 735 (7th Cir. 1969), this court stated:

> A single act may be foundation for drawing the actor within the ambit of a conspiracy . . . But, since conviction of conspiracy requires an intent to participate in the unlawful enterprise, the single act must be such that one may reasonably infer from it such an intent.

*Id.* 407 F.2d at 743.

■ The single act of admitting possession of heroin is insufficient evidence on which to base a conviction for conspiracy to import and distribute that drug. United States v. Koch, 113 F.2d 982 (2d Cir. 1940). Quintana's conviction is reversed and remanded to the trial court with directions to enter an acquittal.

The judgments of conviction as to the defendants Suarez and Alonso are affirmed; the judgment of conviction as to the defendant Quintana is reversed.